BROWN et al. v. FLETCHER et al. (two cases).

(District Court, S. D. New York. July 20, 1917.)

1. USURY ⬤⟲72—EXAMINATION OF CIRCUMSTANCES.

In determining the merits of the defense of usury, it is essential that the surrounding circumstances, the occurrence at the time of making the agreement through which plaintiffs claim, and the instruments drawn be examined to determine the character of the transaction.

2. USURY ⬤⟲59—CHARACTER OF TRANSACTION AS LOAN—INSURANCE.

Where the beneficiary of testamentary trusts arranged to raise money on his legacy payable in the future, and the parties advancing the funds required that he insure his life as security, a delay of a few days in the actual issuance of the life policies actually arranged for as part of the transaction did not prevent the transaction being a usurious loan on the security of the legacy instead of a purchase of the beneficiary's interest, since the matter of taking out insurance does not affect such transactions as a matter of law. but as a matter of evidence and the intent of the parties, which is as fully shown by a positive arrangement for life insurance to be given at once as by actual issuance of policy.

3. USURY ⬤⟲117—ADVANCEMENT ON LEGACY AS LOAN—SUFFICIENCY OF EVIDENCE.

In actions to declare a right in plaintiffs to portions of the principal of two trust funds created by a will, though defendant's assignment of part of his beneficial interest purported to sell, assign, etc., to plaintiffs' predecessor part of the amount ultimately coming to defendant, evidence *held* to show that the transaction was a loan and the assignment was a mere cloak for usury.

4. USURY ⬤⟲128—CORRUPT INCEPTION OF TRANSACTION.

Assignments of part of the interest of the beneficiary in a testamentary trust, being usurious at inception, the transaction between the beneficiary and plaintiffs' predecessors being a loan, and not a transfer or sale, are corrupt instruments in whosever hands they came.

In Equity. Actions by John A. S. Brown and Frank E. Schermerhorn, as trustee for Clara Schermerhorn, under the last will and testament of Thomas Cunningham, deceased, against Austin B. Fletcher, as testamentary trustee of Conrad Morris Braker, under the last will and testament of Conrad Braker, Jr., deceased, and Conrad Morris Braker. Decree dismissing the bill directed for defendants.

See, also, 203 Fed. 70; 239 Fed. 360.

Fredric W. Frost, of New York City (Herbert C. Smyth, of New York City, Monroe Buckley, of Philadelphia, Pa., and Frederick W. Bisgood, of New York City, of counsel), for complainants.

Safford A. Crummey, of New York City (Selden Bacon, of New York City, of counsel), for defendant Braker.

MANTON, District Judge. Conrad Braker, Jr., died July 21, 1890. His will duly proved, contains the following provisions:

---

⬤⟲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"Fourteenth. Out of the above said other one-half of all the rest, residue and remainder of my estate, both real and personal wherever situated, I give and bequeath to Henry J. Braker the sum of fifty thousand dollars ($50,000), and I direct that the same shall be paid to him within nineteen months from the date of my decease, and that he shall hold the same in trust and securely invested for the special benefit of my son, Conrad Morris Braker, and I direct that the interest or increase on the same or on such amount as shall be unpaid as hereinafter set forth, shall be paid to him quarterly so long as he shall live, but I further direct that if he be living at the expiration of ten years from the date of my decease that the said trustee shall pay to my son, said Conrad Morris Braker, the sum of twenty thousand dollars ($20,000) of said principal, together with any accrued and unpaid interest should there be any, and the same shall be and belong to him absolutely.

"Should my said son be living at the expiration of fifteen years from the date of my decease, I direct that he shall be paid the further sum of twenty thousand dollars ($20,000), together with any accrued and unpaid interest on the said remaining thirty thousand dollars ($30,000) and the same shall be and belong to him absolutely.

"Should my said son be living at the expiration of twenty years from the date of my decease, I direct that the remaining ten thousand dollars ($10,000) of the above-mentioned sum, together with any accrued and unpaid interest on the said remaining ten thousand dollars ($10,000) shall be paid to him and the same shall be and belong to him absolutely.

"Fifteenth. Out of the said other one-half of all the rest, residue and remainder of my estate, both real and personal wheresover situated, I give and bequeath to my son Henry J. Braker, the further sum of fifty thousand dollars ($50,000), and I direct that the same shall be paid to him within three years from the date of my decease, and that he shall hold the same in trust and securely invest it for the benefit of my said son, Conrad Morris Braker, paying him the interest derived from the same semiannually from the date of my decease until he shall attain the age of fifty-five years, when I direct that the principal and any unpaid interest shall be paid to him and belong to him absolutely.

"In the event of the death of my said son, Conrad Morris Braker, before he attains the age of fifty-five years, I direct that the income derived from the said fifty thousand dollars ($50,000) shall be paid semiannually to Florence L. Braker, wife of my said son, Conrad Morris Braker, so long as she shall live and remains unmarried; in the event of her marriage or death, I direct that the said fifty thousand dollars ($50,000) shall be given to my grandchild, Florence May Braker if she then be living, and if she be not living then the said fifty thousand dollars ($50,000) shall be paid to my son Henry J. Braker if he be living, if he be dead, I direct that it sink into my residuary estate."

These two actions are brought to declare a right of the plaintiffs to portions of the principal of the two trust funds created by the foregoing paragraphs of the will. The first will be referred to as equity 10—112, action No. 1, involving the claim of $17,500 under the fifteenth clause of the will, and the second will be referred to as equity 7—231, action No. 2, to recover $10,000 under the fourteenth clause of the will.

Some time prior to April 18, 1901, Conrad Morris Braker, through Charles V. Hellfrich, applied for a loan of $5,000 on some of the deferred interest in his father's estate. Hellfrich admittedly was a broker who made a specialty of raising money on inheritances, securing commissions on insurance from such transactions. He had past experience with Burr and Depue, who were engaged in loaning on inheritances of this character. Braker was correctly described, in a previous litigation involving the collection of moneys loaned under other provisions of his father's will, as incapable of managing his own affairs, and

recognized as such by his father, as indeed the terms of his will would indicate.

On April 18, 1901, Braker executed an assignment in writing to Frank L. Rabe of seven-tenths of all of his right, title, and interest in the contingent remainder bequeathed to him under the fifteenth clause of his father's will. On June 3, 1901, he executed another assignment of all his remaining right, title, and interest (two previous assignments affecting this interest having been made) in the contingent remainder bequeathed to him under the fourteenth clause of his father's will. On October 1, 1901, Rabe assigned to the New York Finance Company, a domestic corporation, all of the interest which he had acquired by reason of the two Braker assignments. Rabe admittedly was a mere dummy and a clerk in the office of Depue. For these assignments Braker received $3,500 in the first case, and $2,500 in the second. Burr and Depue do not agree as to who was the actual lender of the money. Burr claimed that his part in the transaction was that of attorney for certain clients of his, who loaned certain money to Depue and his associates, with which to carry out the transaction. Depue denied that he was the principal.

The New York Finance Company was organized by Burr, Depue, and Cockran. Cockran claims to have acted as attorney holding only a nominal amount of stock, sufficient to become a director. Burr seems to have been the chief stockholder. Depue was president of the corporation, and later Hellfrich became president, and was actively so for two years before Braker met him. At all events this company, as a medium of operation through these men, had a good many transactions of this type. They were of sufficient intelligence and experience to draw agreements and papers such as are presented here in making the claim. These were alleged assignments of the interests under the will. Hellfrich had a separate insurance business for the purpose of securing policies on transactions of the character of those under consideration.

[1] Hellfrich testified that when Braker asked him for a loan he told him it would be impossible to get a loan of $5,000, but that he would find a purchaser for part of his interest. Braker testified that the transaction was a loan. In examining to determine the merits of the defense of usury interposed here, it is essential that the surrounding circumstances, the occurrence at the time of the making of the agreement and the instruments drawn, be examined to determine the character of the transaction.

The money lenders or purchasers of these legacies have had considerable litigation in the courts when they were involved in another transaction as the New York Finance Company, and the language of the court there is of aid in reaching a determination of this question. In Wetzlar v. Wood, 143 App. Div. 311, 128 N. Y. Supp. 501, the court said:

"Every time an assignment was executed by the plaintiff Burr or Depue procured him to verify an affidavit setting forth his interest in the said estates, that he had not transferred it, and that there were no liens or incumbrances thereon, and that it was made for the purpose of inducing the New York Finance Company to purchase a certain part of his interest. The learned trial justice was of the opinion that the plaintiff was concluded by those

affidavits upon the proposition that the transactions were purchases, but the successful effort to complicate the transactions and the procurement of affidavits in advance to support them have exactly the opposite effect to that intended. Legitimate transactions are conducted with more directness and without being bolstered up by affidavits. All of the surrounding circumstances tend to corroborate the plaintiff. The story of Burr and Depue is demonstrably false. The documents themselves furnish strong internal evidence that they were mere covers for usurious loans, and even if there was a doubt as to whether the transaction was a purchase and sale or a loan, its unconscionable character should resolve that doubt in favor of a loan."

Here affidavits of the character described in the foregoing excerpt were secured.

The amount involved in the transaction of April 18, 1901, was $17,500. Braker says that he tried to borrow $5,000. This is not disputed. He further says that he informed Mr. Depue that at 55 years of age he was to receive $50,000. Depue said he would be unable to loan him $5,000, but that he might arrange to get $3,500, but that he (Braker) might not live until he was 55 years of age, and it would be necessary to have his life insured for him or any party that he might name. It was then agreed that insurance to the extent of $15,000 be obtained and a loan of $3,500 made. Depue testified:

That he explained to Mr. Braker that he could not get a loan on his interest; that the security was one that could not be realized on readily. "It was not the sort of security that anybody would be likely to loan any money on, and, as far as I was concerned, I did not want to refer it to anybody. * * * I told him that I would try and arrange for a sale of a certain part of his estate; that I knew some one I could refer to, and I thought perhaps I could make an arrangement."

His plan was to borrow $5,000 in the name of Rabe, a dummy, on the security of but half the assigned part of the legacy of which $3,500 was to be turned over to Braker. He admits that he made the false representation to him that it would be impossible for him to secure a loan on such security. At this time Depue says that he knew that there were loans on one fund to Loeb and Sage amounting to $13,000, although on the face of these assignments to Loeb and Sage they were absolute. Depue here admits that he understood the type of these transactions. According to Braker, his original proposal was that Depue's clients should loan him $5,000 on the security of the $50,000 trust fund under the fifteenth clause, and when Depue said he would loan him only $3,500, he told Depue that, if he only loaned him $3,500, he would assign only $35,000 of the fund under the fifteenth clause, and if he would only loan $3,500, Depue would have to pay the insurance premiums. That Depue intended to get $35,000 is unquestionable. The document which is claimed to be an assignment of the seven-tenths interest of Braker in the $50,000 trust fund under the fifteenth clause started off in form as an assignment, and further along changes into an instrument to bring about an assured payment of $35,000, the purchaser evincing entire unwillingness to take any risk about seven-tenths of the fund amounting to $35,000.

The beginning of the instrument recites the assignment of seven-tenths of the defendant's estate, the right, title, and interest to the principal sum of $50,000. Depue testified:

"XQ. 58. What was the proposal that you submitted? A. The proposal was that he should assign seven-tenths of his interest under a certain clause in the will; I think it was the fifteenth clause, amounting to $35,000. XQ. 59. For how much? A. $3,500. XQ. 60. Is that the whole of the proposition? A. Well, no; the $35,000, it was a contingent interest and a long time to wait, and, as I recall it, at that time we looked into the question of security and had seen Mr. Fletcher and found out that the securities were all there, and that the estate was in good condition, but there were some 12 or 14 years to wait, something of that sort, and it was explained to them that this $35,000 was to be a charge rather than a sale of this seven-tenths, and if this particular clause under the will did not produce the $35,000 for any reason whatever when the estate came into the possession of. Mr. Braker, that it was to be charged up on some other clause of the will. XQ. 61. So you were to get the $35,000? A. We were to get the $35,000 in any event provided he lived until he attained a certain age. XQ. 62. Anything further said? A. There was some discussion about insurance. XQ. 63. What was it? A. He was to provide insurance if he could. XQ. 64. Anything further said about it? A. I think not. XQ. 65. Who said 'if he could'? A. Mr. Hellfrich. Mr. Hellfrich was in the insurance business. * * * XQ. 71. Was there any doubt expressed at that time of the possibility of getting insurance on Mr. Braker's life? A. No. XQ. 72. Nothing said to that effect? A. No. XQ. 73. And was there any suggestion as to what policies should be taken out? A. I think that was left to Mr. Hellfrich. XQ. 74. He was an insurance agent? A. He was in the insurance business; yes."

This feature of the transaction does not show intention to make a sale of the legacy. If it were a sale, the buyer would take all chances of depletion of the fund. It evinced a desire on the part of the parties to provide for a payment of money, and that a repayment of the amount advanced plus the difference between that sum and $35,000. The instrument further provides that, if the funds in the two clauses are inadequate, Rabe shall receive $35,000. This is a repayment with usurious interest. For further security, it was arranged that $15,000 of life insurance be secured. An application was signed on April 17th and filed on the 18th. The risk was approved on the 18th. The original policy for $15,000 was modified on April 18th so as to make two policies of $7,500 each; it evidently being intended that one of these policies be assigned as collateral security for the $5,000 loan from Bushnell. The two policies were issued April 23d. The assignment of the legacy is dated and acknowledged April 18. The affidavit accompanying it was verified the 24th of April, and the assignments and the policy bear date on that day. Depue said that $500 of the $3,500 was paid over to Braker on the 18th of April, and $3,000 on the 24th of April. He attempted to support this by showing two checks drawn by Burr on his Philadelphia bank, each payable to the bank itself, one for $500 on April 17th, and one for $3,000 on April 23d. These checks were given to the bank for a draft on New York for Braker. Neither check showed when it was presented or paid. Braker says that he received $3,500 on April 24th in one lump sum, and his cashbook showing the receipt of that money indicates such an entry on the 24th of April as would the affidavit of April 24th and the assignments of the insurance policies. There is nothing to show on the check itself when it was paid.

The issue then must be decided as between the word of Braker and Depue. I concluded that the money was paid on April

24th, the date of the insurance policy and of the affidavit; for I am satisfied by Depue's method of doing business he did not give up any of the money until he had all the papers signed, sealed, and delivered. Kline, the agent of the insurance company, says that the premiums were paid to the company, not by Hellfrich, as he testified, but by its general agent, Mr. Abernathy, and this on May 24, 1901. However, the giving of the policies was originally arranged for, the applications for the policies were signed April 17th, the medical examination had and the risk approved on the 18th, and the same day the application was modified to two $7,500 policies, so that, even if $500 was paid on the 18th, nothing remained to be done to put the policies in force but the payment of the premium. There was the approval of the insurance risk, and there was the delivery of the policies at the time of the payment of the $3,500. The premium was paid out of Braker's $3,500, so that, in fact, he received only $3,000.

[2] The plaintiff's contention that a delay of a few days in the actual issuance of the policies actually arranged for as part of the transaction would prevent the transaction being a loan rests on the misapprehension of the part played by insurance in such transactions. The matter of taking out insurance does not affect transactions as a matter of law, but as a matter of evidence and intent of the parties, and that intent is as fully shown by a positive arrangement for life insurance to be given at once as by actual issuance and delivery of the policy. The insurance was an integral part of the transaction.

Between April 18th and April 24th Rabe borrowed $5,000 from Charles E. Bushnell, Burr's client, on the half interest of the $35,000 charge so obtained from Braker. Rabe also borrowed $10,000 some two months afterward from Mrs. McCollum on the security of the other half interest in the $35,000 and the other fund here involved in the $10,000 suit in action No. 2. This indicates that Burr was in fact the principal in the transaction. It appears, therefore, that Depue's story that he could not obtain a loan of $5,000 was not truthful, and that a loan of $5,000 was procured from Bushnell on the half interest covered by the assignment in action No. 1. The result of the language of the instrument called the assignment is that security was given to Rabe of seven-tenths of the $50,000 fund, and also in the other sum due Braker from his father's estate, assuring to Rabe $35,000.

[3] While the assignment under these circumstances purports to sell, assign, transfer, and set over unto Rabe, $35,000, it is perfectly clear that the transaction was a loan of money, and that the pretended assignment was a mere cloak for usury. The case is similar to Wetzlar v. Wood, 143 App. Div. 311, 128 N. Y. Supp. 501; Mercantile Trust Co. v. Gimbernat, 134 App. Div. 410, 119 N. Y. Supp. 103; Hall v. Eagle Insurance Co., 151 App. Div. 815, 136 N. Y. Supp. 774, and Brown v. Robinson, 173 App. Div. 583, 160 N. Y. Supp. 287.

At the time this loan was secured Braker was in a fit condition for imposition. He was pressed for money, his wife was suffering from nervous prostration, and he was in urgent need of money to pay doctors' bills. His father evidently realized his weakness; for he tied up

his money so that he would not enjoy the benefits of it until he reached the age of 55 years.

I therefore hold that this transaction was a loan, and not a sale, of Braker's seven-tenths interest in his legacy of $50,000 as claimed by the plaintiffs.

The second loan to Braker was in June, 1901. Hellfrich acted as the broker in this transaction, and received the fee which covered a portion of the usurious charge. Why business was not transacted directly by Depue is not explained. Hellfrich brought him to Burr. At this time there was about due the $50,000 under the fourteenth clause, $20,000 of which had already been paid to Braker. There remained to be paid him $20,000 on the 21st of July, 1905, and $10,000 on the 21st of July, 1910. Braker had already borrowed from Loeb and Sage and promised to repay them out of the $20,000 installment due July 21, 1905, $5,000 and $8,000, respectively. Out of this $20,000 installment due July 21, 1905, these payments were made, leaving $7,000 unappropriated. Braker asked to borrow $3,000 or $3,500, agreeing to assign the $7,000 maturing in 1905. Burr refused to advance more than $2,500, and asked for an assignment, not only of the $7,000, the balance of the $20,000 payment, but also of the $10,000 installment maturing July 21, 1910. Thus he was to have $17,000 for a loan of $2,500. Braker testified that he said to him:

"Mr. Burr, you have already $15,000 worth of insurance in the Equitable Life Insurance Society, which will cover you for the loans that you have loaned me."

Burr said there was still $5,000 on his life subject to the assignment of Loeb, and demanded that he put up this and also the other $8,000 life insurance, subject to Sage's claim. Burr offered then to advance $2,500, and Braker says "as a loan." Burr's version is that it was talked of as a sale, and not a loan. A similar assignment of the interests in the estate and affidavits that the transaction was a sale and an assignment of the Loeb policy was taken. This transaction was disclosed by Cockran on the 13th of June, 1901. Braker received $750, Cockran saying that the balance of the money would be received in a few days and paid. Braker waited for about ten days, telephoned to Burr in Philadelphia, and Depue came over in the afternoon with $1,600 more and paid Braker; the remaining $150 Braker says he never received. It was about this time that a loan was made by Mrs. McCollum on the half interest in the $35,000. This transaction was adjudicated as usurious by Judge Greenbaum in the state court in an action against the New York Finance Company, but the plaintiffs herein were not parties to the action. The whole transaction is robed with the same cloak of usury. There was no opportunity for loss in any case or under any possible circumstances, and the principal must be repaid in either transaction.

Rabe had already $15,000 insurance on Braker's life in the Equitable which was an enforceable obligation from the time the money was advanced, and was so intended by the parties. He had also an equity in the policies held by Sage, and he had an additional assignment of the policy to Loeb subject to Loeb's claim, so that he had $28,000 of life

insurance subject only to the claims of Sage and Loeb for $13,000 to protect advances to Braker of $3,500 and $2,500. After the New York Finance Company was organized, Rabe assigned this assignment as well as the first to it. When the payment was made on July 20, 1905, of $20,000 under the fourteenth clause of the will, $5,000 was paid to Loeb, $8,000 to Sage, and $7,000 to the New York Finance Company. While the Sage and Loeb transactions were usurious, payment thereof will not affect the determination of the question in this transaction.

A question similar to the one here involved came up before Judge Hand of this court in Provident Life & Trust Co. v. Austin B. Fletcher et al., 237 Fed. 104. This was an assignment under the fifteenth and sixteenth clauses of the will. There it was held that the transaction was an assignment, and not a loan, but there is very strong intimation in the opinion that, if the plaintiff there was fully protected by insurance, the result would have been different. Judge Hand said:

"I think it clear that the life insurance policies should not be taken as applicable to the transaction of February 25, 1902, and yet it is only if they were so intended that they may be considered upon the question of usury. * * * Moreover, * * * if they had intended the policies to stand as security for the transactions at bar, their intent would have been ineffectual, because the Rabe transactions were void for usury, and with them fell the policies."

The plaintiffs loaned $10,000 to the New York Finance Company and received, as security, an assignment of these two alleged assignments to Rabe, and claim that they received absolute title thereto by reason of the sale at public auction in Philadelphia under a foreclosure of their lien. A note was given by the New York Finance Company for $10,000 maturing July 20, 1910. The collateral agreement was executed extending the maturity of the note to February 15, 1913, in consideration of which extension a further note of $3,333 was given by Brown and Schermerhorn. There seems to be considerable excess interest or charge for this extension in payment of the note. In other words, this transaction had its secret agreement to pay $3,333 extra and indicates that clients of Burr, the plaintiffs, were participating in the proposed usurious benefits. They had notice that the original transaction was not had at sale, that the papers attempted to make it out to be, though the customary separate receipt for the consideration of $1 was given. They do not seem to have made any inquiry from Braker to find out the nature of the transaction or to learn anything about the nominal consideration of $1 mentioned in the receipt. They seem to have been connected with Burr and employed him as attorney for Brown and Schermerhorn to collect from the New York Finance Company, in which he was largely interested. When an action was started in the state court, Burr asserted that the New York Finance Company was the real party while he was acting as attorney for Brown and Schermerhorn in foreclosing on the New York Finance Company, and concealment by Brown and Schermerhorn of their foreclosure sale from Braker indicates that they were not bona fide purchasers. Indeed, Burr seems to be financing the litigation and to be the real party in interest.

[4] I think the rule may be fittingly applied that the papers, being usurious at inception, are corrupt instruments into whosever hands they come. Miller v. Zeimer, 111 N. Y. 441, 18 N. E. 716; Thompson v. Berry, 3 Johns. Ch. 395. There is no claim that the plaintiffs saw the affidavits of Braker and his wife, which accompany the assignments, nor is there any claim of estoppel.

Plaintiffs claim that they placed the matter in Burr's hands to collect from the New York Finance Company (and this really meant to collect from Burr). No payment was made for 3½ years. Mr. Crummey, counsel for Braker, wrote a letter to Brown on April 29th advancing the claim that the assignment was not a sale, but a loan and usurious. This caused activity on the part of the plaintiffs. They did not discuss it with Mr. Crummey by letter or in person, but it resulted in Mr. Burr, representing his clients, foreclosing on these claims and offering them for sale in Philadelphia, and Wolf, a dummy for Burr, purchased at this sale, and this for the plaintiffs. This seems to have been done without notice to Mr. Crummey or Mr. Braker; the advertising was in the Philadelphia papers and Braker, and his attorney lived in New York. I think that, instead of trying to give publicity to this sale, the effort was to guard against notice being received by Braker and to carry it on in secrecy as against him. The relations of Brown and Schermerhorn with Burr in previous transactions in the lending of money satisfies me that the plaintiffs were not innocent purchasers, and cannot rest upon the claim that they did not know the real transaction at the time of the advancing of the money to Braker and the drawing of the instruments in question.

I am satisfied upon all the evidence that the moneys so advanced were loaned to Braker, that a usurious interest was charged, and that they are void. The money lenders here were protected from all loss under all possible circumstances; they were sure to have the principal repaid. This the policies of insurance gave to them. Wetzlar v. Wood, 143 App. Div. 311, 128 N. Y. Supp. 501; Id., 214 N. Y. 639, 108 N. E. 1111; Hall v. Eagle Ins. Co., 151 App. Div. 815, 136 N. Y. Supp. 774; Id., 211 N. Y. 507, 105 N. E. 1085; Hartley v. Eagle Ins. Co., 167 App. Div. 230, 152 N. Y. Supp. 686; Braker v. New York Finance Co., 155 App. Div. 894, 139 N. Y. Supp. 1117; Id., 214 N. Y. 683, 108 N. E. 1090.

The defendants may have a decree dismissing the bill.