275 F.2d 755
 Margaret DE KORWIN, etc., Plaintiff,
v.
FIRST NATIONAL BANK OF CHICAGO, etc., et al., Defendants.
FIRST NATIONAL BANK OF CHICAGO, as Trustee under the Will of Otto Young, Deceased, Petitioner-Appellee,
v.
Graveraet Young KAUFMAN, Respondent-Appellee, and
Dr. Louis Ruttenberg et al., Respondents-Appellants in No. 12572, and
Henry N. Rapaport et al., Respondents-Appellants in No. 12573, and
Karl C. Jacobs et al., Respondents-Appellants in No. 12574.
 Nos. 12571-12574.
 United States Court of Appeals Seventh Circuit.
 February 3, 1960.
 Rehearing Denied in No. 12573 April 11, 1960.
 
 COPYRIGHT MATERIAL OMITTED Thomas Hart Fisher, Norman Crawford, Chicago, Ill., for Arthur N. Pierson, Jr., and others, appellants.
 Louis L. Kahn, Jack A. Diamond, Chicago, Ill., for respondents-appellants Dr. Louis Rutenberg and others.
 Hamilton Smith, McDermott, Will & Emery, Daniel M. Schuyler, Chicago, Ill., Donald B. Jones, Newark, N. J., Jay Stough, Joseph R. Julin, William M. James, Jr., Robert V. R. Dalenberg, Chicago, Ill., for respondents-appellants Donald B. Jones and others.
 Horace A. Young, William B. McIlvaine, A. Leslie Hodson, Charles R. Aiken, Richard F. Watt, Chicago, Ill., for appellee.
 Before DUFFY, KNOCH and CASTLE, Circuit Judges.
 DUFFY, Circuit Judge.
 
 
 1
 Otto Young died November 30, 1906. By his will, he created a trust which was to terminate upon the death of his last surviving daughter, provided his youngest surviving grandchild had attained the age of twenty-one years. Upon termination, the corpus of the trust was to be distributed equally among his grandchildren, with issue of deceased grandchildren representing their parent per stirpes. This appeal involves another phase of extensive litigation[1] growing out of the will of Otto Young, deceased.
 
 
 2
 In 1943, an action was initiated in the United States District Court for the Northern District of Illinois to construe the will of Otto Young. This action culminated in a decision by this Court that, inter alia, the grandchildren's future interests were vested subject to divestment. DeKorwin v. First National Bank of Chicago, 7 Cir., 179 F.2d 347. Following this decision, Graveraet Young Kaufman, whose mother was then the testator's last surviving daughter, began to make various assignments in New York which purported to convey portions of his remainder interest. The last of these assignments was dated August 7, 1956. Kaufman's mother died on August 17, 1956.
 
 
 3
 On September 4, 1956, The First National Bank of Chicago, as Trustee of the estate of Otto Young, petitioned the District Court for instructions. It alleged, among other things, that it had notice of the assignments made by Kaufman and sought the aid of the Court in determining to whom it should pay Kaufman's share of the corpus of the trust.[2] In his answer to the Trustee's petition, Kaufman alleged that the remainder interest was not assignable by virtue of the spendthrift clause of the will of Otto Young, and also that the assignments were void as they were loan transactions which violated the usury statutes of the State of New York.
 
 
 4
 On October 14, 1957, Henry N. Rapaport filed a motion for summary judgment directing the Trustee to pay him in excess of $247,000 of Kaufman's remainder interest. As to a portion of this amount, Rapaport is acting as attorney to collect for the estate of Gustave Rubner, deceased. Rapaport was subsequently joined by five other parties who seek to recover various sums from Kaufman's remainder interest. All of these parties, who are appellants in Appeal No. 12573, are sub-assignees of parts of five assignments which originally were made by Kaufman to one Philip Rosen.
 
 
 5
 In answer to this motion, Kaufman again alleged the assignments were void as being violative of the spendthrift clause in Young's will, and that they violated the usury statutes of the State of New York where they were executed. In addition, Kaufman filed a motion for summary judgment against the various claimants.
 
 
 6
 On November 12, 1958, the District Court filed a "Memorandum of Decision". This is a lengthy document consisting of forty-two pages of the printed record. It covered a number of points that had been litigated. The Court held, inter alia: 1) the spendthrift clause of the will applied to corpus; 2) the assignments could not be enforced against the Trustee, hence claimants' motion for a summary judgment was denied; 3) there was a statement in the decision that claimants could bring an action against Kaufman if their assignments were valid; 4) that a determination of the issue of usury would require a trial to determine various issues of fact, but that such a trial was unnecessary as the assignments constituted valid, enforceable loans at an implied interest rate of six percent. The Court then ordered an accounting to determine the amount actually paid to Kaufman for the assignments as well as proper out-of-pocket expenses of the assignees.
 
 
 7
 From this order the claimants (in Appeal No. 12573) appealed, claiming 1) the spendthrift clause of the will does not apply to corpus; 2) the assignments were valid sales of future interests and the usury laws are not applicable to them; and 3) Kaufman is estopped to challenge the validity of the assignments. The claimants in Appeals Nos. 12572 and 12574 also have appealed from this order. They do not claim under the five assignments here at issue, but do claim under other assignments made by Kaufman, and contend that any decision on the issues raised in the instant appeal will materially affect their rights. Appellants in Appeal No. 12571 contend their rights should not be affected by our decision in Appeal No. 12573, and request that we so state. The appellants in Appeal No. 12571 claim under other assignments made by Kaufman and other grandchildren of Otto Young.
 
 
 8
 Kaufman was a man experienced in matters of finance and loans. From 1921 to 1932, he was associated with one of the large banks in New York City. His early experiences were with the discount, collateral loans and credit departments. By 1926, he was an assistant vice president where his duties included the analysis of loans. From 1928 to 1932, he was a first vice president of the bank and received an annual salary as high as $34,000. He was in charge of the bank's largest branch office, and served on the discount committee which met weekly to discuss loans and other banking matters. He later became associated with several brokerage houses, and in 1946 became associated with a bank where he was employed until 1951.
 
 
 9
 Kaufman made his first assignment on September 25, 1950. At that time he was fifty years old. From 1947 through the middle of 1950, he received at least $1000 a month from his mother. From 1946 through 1951, he earned a salary of $3000 per year plus an expense account of from $1200 to $2400 per year.
 
 
 10
 Prior to making his first assignment of a portion of his remainder interest, Kaufman attempted to borrow on that interest by offering it as security. He was unable to arrange such loans. In 1950, Kaufman negotiated with Rosen for the sale of part of his remainder interest. In these negotiations it was suggested that insurance on Kaufman's life was essential to protect the assignees in the event he predeceased his mother, in which case Kaufman's remainder interest would terminate. However, it was never suggested that Kaufman pay for such insurance and, in fact, he never did pay any premiums.
 
 
 11
 The assignments in issue were made in April, July, November and December of 1951, and in April of 1952. In these assignments Kaufman purported to grant, bargain, sell, assign, transfer, and set over to Rosen all of his right, title and interest to the corpus of the trust to the extent of $62,500, $42,000, $42,000, $87,500 and $87,500, respectively. The amounts paid to Kaufman were $15,000, $10,075, $10,000, $20,000 and $20,000 respectively. Thus, by the five assignments, Kaufman purportedly sold an interest of $321,500 of his remainder for $75,075. Contemporaneously with the assignments, Kaufman executed affidavits which recited that the assignments were made of his own free will, and that in his opinion the consideration was fair and adequate. At the time of the sub-assignments to Rapaport, Kaufman executed an estoppel certificate stating that the assignments were valid and subsisting, that he had no defenses, offsets, or counterclaims thereto, that he had sold the portions of his interest, and that he agreed to the sale. At the time of the various assignments, Rosen took out insurance on Kaufman's life. The total coverage amounted to $159,000. This amount was determined by Rosen. All premiums on such insurance were paid by Rosen or the sub-assignees.
 
 
 12
 Concerning the holding by the District Court that the spendthrift clause of the will applied to corpus, appellants contend Judge Igoe's earlier decision to the contrary is res judicata. In his earlier opinion, Judge Igoe stated (84 F. Supp. 918, 929-930): "The leaning upon the spendthrift trust clause by counsel for the Bank, in this connection, affords no support for its position. The testator when inserting this clause in the income gifts was concerned only with protection of the income beneficiaries against creditors. And if, as the Bank contends, the testator had a different purpose in mind, the absence of a spendthrift clause from the gifts of corpus is not without significance as supporting the plaintiff's position."
 
 
 13
 In the argument in the District Court prior to the first decision, Attorney Aiken, who now represents Kaufman but who did not represent him in the earlier proceeding, asked: "How can anyone say that provision expressly made for the `comfortable support and maintenance of my daughters and their issue,' can be carried over to ultimate division of the corpus?"
 
 
 14
 In the action to determine whether the remainder interests of the grandchildren were vested or contingent, the argument was made that such remainders could not be vested because of the spendthrift clause. In 179 F.2d 347, we affirmed the holding of the District Court that the remainders were vested, but we did not comment upon the applicability of the spendthrift clause to corpus. Kaufman did not assign any of his remainder interest until after the decision of this Court just mentioned.
 
 
 15
 In our view, Judge Igoe was correct in his first decision in 1949. We hold the spendthrift clause in the Otto Young will[3] does not apply to corpus. When the testator referred to the provision in the will which he was making for the "comfortable support and maintenance of my daughters and their issue", he was referring to income and not to corpus.
 
 
 16
 We think the use of the terms "annuities" and "payments" in the spendthrift clause indicates that it applies only to income. Throughout the will, the term "annuity" is used by the testator to refer to a periodic payment of a sum of money. The term "payment" is used fifty-nine times in the will, and always refers to the payment of income. The bulk of the corpus of the estate was real estate. In providing for the distribution of corpus, the testator used the term "divided" indicating thereby a distribution in kind and not a payment of money.
 
 
 17
 The construction we have reached is supported by the case of LaSalle National Bank v. MacDonald, 1954, 2 Ill. 2d 581, 119 N.E.2d 266, 267, 46 A.L.R. 2d 901. The Court was there called upon to determine whether a spendthrift clause applied to corpus so as to preclude the Trustee from distributing the share of an incompetent to her Conservator. The clause in question provided: "`I further direct that the payments to all beneficiaries of my estate be made to such beneficiaries in person or upon their personal receipt, and that no interest of any beneficiary be assignable in anticipation of payment or be liable in any way for such beneficiary's debts.'"
 
 
 18
 The Court held at 119 N.E.2d 269: "Paragraph 7 relates solely to the `payment' of income from the trust. At the opening words of the next paragraph, `I further direct that the payments' also seem to relate most naturally to payments of income. Use of the plural `payments' in paragraph 8 does not, we think, indicate an intention to include principal as well as income. The testator consistently distinguished between the `payment' of income and the `distribution' of principal."
 
 
 19
 In Potter v. Couch, 1891, 141 U.S. 296, 11 S.Ct. 1005, 35 L.Ed. 721, the Supreme Court held that forfeiture restraint on the alienation of an equitable fee in Illinois lands was void. This Court, in Danning v. Lederer, 232 F.2d 610, 612, 613, pointed out that the Potter case had no bearing on the point we were then considering "* * * because it (Potter) was decided in 1891, before spendthrift clauses had been accepted as a valid restraint on the alienation of an equitable interest in the corpus of a trust in Illinois."
 
 
 20
 The conclusion we reach that the spendthrift clause did not apply to corpus is not conclusive in the determination of the issues before us. True, it was one of the reasons for the decision of the trial court, but we think the decision of that court can be sustained on another ground.
 
 
 21
 Appellants argue that the New York usury statutes apply only to loans and not to sales. They urge that whether a certain transaction is a loan or a sale must be determined by ascertaining the intention of the parties. In the case at bar, they point to the wording of the assignments, the affidavits executed in connection with the assignments and Kaufman's testimony. They also contend that the matter of insurance taken out on Kaufman's life by the assignee is irrelevant.
 
 
 22
 Ascertainment of the New York law on the question before us poses a difficult problem. Language in some of the New York decisions seems to be directly in conflict with language in other decisions dealing with the same problem. However, we must determine as best we can, the applicable New York law.
 
 
 23
 The trial court held, 170 F.Supp. 112, 128: "In New York, usurious intent is not based upon a finding as to the subjective intention of the parties, but rather on determination as to the effect of the transaction itself. The intent which will violate the statute is a general one, not a specific intent. A transaction may constitute usury even though the parties did not specifically intend to provide for usurious interest. It is sufficient that a consequence of the transaction is exaction of interest greater than what the law allows."
 
 
 24
 The trial court continued: "Where the difference between the amount paid the remainderman plus the maximum legal rate of interest is only `somewhat' less than the amount to be paid the assignee, the court should determine the specific or particular intention of the parties. Fiedler v. Darrin, 50 N.Y. 437; Hartley v. Eagle Insurance Co., 222 N.Y. 178, 118 N.E. 622, 3 A.L.R. 1379; Brown v. Robinson, 224 N.Y. 301, 120 N.E. 694, 21 A.L.R. 777. But the court is not to inquire as to specific intent where `the interest payable [is] so large that, in view of all the circumstances, an intent to provide for the payment of interest beyond the legal rate will necessarily be imputed to them. Fiedler v. Darrin, 50 N.Y. 437.' Hartley v. Eagle Insurance Co. 222 N.Y. 178, 187, 118 N.E. 622, 625."
 
 
 25
 New York courts have considered a number of so-called sales of remainder interests, some at prices far below their value determined actuarily. In most of such cases the word "loan" was not mentioned, and the transaction was in the form of a sale. Nevertheless, the New York courts concluded that many such transactions were loans.
 
 
 26
 Other New York cases have not first decided whether the transaction was a sale or a loan but have made a single determination of the issue of sale or usurious loan. The test was stated by Judge Learned Hand in Provident Life & Trust Company v. Fletcher, D.C., 237 F. 104, 108-109, (affirmed 2 Cir., 258 F. 583), where it was stated: "* * * the first question of law which arises is whether the transaction, without the security of any life insurance policies, was usurious. * * * The general test is whether the principal is put at any genuine hazard. * * *" After citing numerous New York cases, Judge Hand in the opinion, continued: "In all these cases, either in one way or another the payment of principal was secured beyond any but colorable hazard. Now it is quite clear that in the case at bar the parties started out, as I have said, upon a usurious transaction, and if Braker had been able to secure a policy of life insurance nothing could be said for its validity, because the principal would have been secured under all contingencies. But he was unable to get any insurance policy, and the necessary result, whatever the original purpose, was to imperil the principal, not upon a mere colorable hazard, but upon a genuine one."
 
 
 27
 Where a remainder is vested but subject to divestment, as in the case at bar, then the presence of insurance under New York law does affect the transactions. Brown v. Fletcher, D.C., 244 F. 854, 859. In the Brown case the court of appeals for the Second Circuit was impressed by the presence of insurance, while the absence of insurance was perhaps decisive in Judge Hand's decision in the Provident Life case hereinbefore referred to.
 
 
 28
 Although a personal obligation to repay the amount advanced is not essential under New York law to create a loan, nonetheless the New York courts have emphasized provisions in assignments which impose some personal obligation upon the assignor. In the case at bar Kaufman agreed "that if the sum of Forty-two Thousand Dollars ($42,000) herein assigned to Philip S. Rosen is paid to me by operation of law or by reason of the trustee's failure or refusal to pay the said sum directly to Philip S. Rosen * * * or if for any reason whatsoever the said sum shall come into my hands, then and in such case, I shall hold the same in trust for the benefit of Philip S. Rosen, and forthwith pay the same sum over to him without further demand or direction."[4] This provision would seem to impose a personal obligation on Kaufman, in the event the assignee fails to make collection directly out of the trust estate, that he will pay from funds which come into his hands from the trustee. The trial court held that Kaufman could be required to hold for the benefit of his assignees such sums as he received from the trustee. We think this was a correct interpretation of New York law.
 
 
 29
 Briefs submitted by Rapaport et al., and by Jones et al., in Appeal No. 12573, seem to admit that at an earlier date New York courts would have regarded the Kaufman assignments void for usury, but contend that later New York decisions have changed that view. Appellants rely heavily on Hartley v. Eagle Insurance Co., 1918, 222 N.Y. 178, 118 N.E. 622, 3 A.L.R. 1379, and Brown v. Robinson, 1918, 224 N.Y. 301, 120 N.E. 694. The appellants contend Hall v. Eagle Insurance Company, 1912, 151 App.Div. 815, 136 N.Y.S. 774 no longer is the law of New York, and that in all cases there must be a finding that the parties had a specific intent to evade the usury statute.
 
 
 30
 There is no language in either Hartley or Brown repudiating the Hall case or any other prior decision of New York courts in which assignments of remainder interests were held to be usurious or were treated as equitable mortgages. We think the specific reference to Fiedler v. Darrin, 1872, 50 N.Y. 437 is significant.
 
 
 31
 In Hartley, the court said, 222 N.Y. 187, 118 N.E. 625: "So here the question is: Did the parties intend to evade the usury statutes of the state, or was the interest payable so large that, in view of all the circumstances, an intent to provide for the payment of interest beyond the legal rate will necessarily be imputed to them?" In Hartley, the court regarded the amount which the assignor was obliged to pay as only slightly in excess of legal interest.
 
 
 32
 Hartley was followed by Brown v. Robinson, 224 N.Y. 301, 120 N.E. 694. In that case the court regarded the amount involved as exceeding legal interest by a "comparatively small amount." The key to the Hartley and Brown decisions lies in those facts which led the New York Court of Appeals to use the words "somewhat in excess" and "comparatively small amount". In the case at bar where Kaufman received only 23% of the face amount of the assignment, the assignee was to receive such a large gain over the amount he paid that, under New York decisions, a usurious intent must be imputed to the parties.
 
 
 33
 In Fiedler v. Darrin, cited by the court in Hartley, the court held that the parties could not avoid the consequences of their act by testifying that they did not intend usury, the court stating that the parties could not give the transaction a different name from that which the law gives it, or designate the transaction as a purchase and sale when the law calls it a loan of money secured by mortgage.
 
 
 34
 The only real risk which faced the assignee Rosen was that Kaufman might die before his mother and leave issue surviving. But this risk was eliminated by the insurance taken out on Kaufman's life. As to the five assignments here at issue, the amount of the insurance was calculated to be approximately equal to the sums advanced, plus interest, plus the cost of insurance for the anticipated life expectancy of Kaufman's mother. The other so-called risks mentioned in the briefs of appellants are merely colorable.
 
 
 35
 In determining that the transactions involved in the case at bar should be treated as loans at legal interest, and that the assignments were in the nature of equitable mortgages, the trial court was following a course marked out by various decisions of New York courts. These courts have many times shown a reluctance to enforce the New York usury statutes to the full. Although disapproving such assignments, they have been unwilling to decree forfeiture of both principal and interest. Instead, they have entered judgments for assignors, finding the transactions void and unenforceable, but such decrees were conditioned upon the assignor paying to the assignee the amount he received, plus interest and plus the costs of making the loan including insurance premiums and the interest thereon. Heise v. Selected Securities Company, Sup., 1907, 105 N.Y.S. 1079, 1082; and Leavitt v. Enos, 1913, 155 App.Div. 584, 140 N.Y.S. 862, 864. In spite of a finding of usury, New York courts fashioned what seemed to them to be an equitable result requiring the assignor to pay the amount he had received, plus interest and costs. In other instances, the same result was reached after considering but not determining the question of usury. Hall v. Eagle Insurance Company, 1912, 151 App.Div. 815, 136 N.Y.S. 774, is perhaps the leading case of this kind in New York. The same result was achieved in the later case of Stotesbury v. Huber, D.C.E.D.N.Y. 1916, 237 F. 413. A more recent decision refusing to enforce assignments at full value is In re Reif's Will, Sur., 1941, 30 N.Y.S.2d 47.
 
 
 36
 We hold that under New York law as announced by various court decisions, the District Court was justified in fashioning the equitable remedy announced in the decree and judgment appealed from herein. In many respects, the judgment was patterned after the decisions in Hall v. Eagle Insurance Company, supra, and Stotesbury v. Huber, supra.
 
 
 37
 Rapaport strongly urges that Kaufman is estopped from asserting usury against him because of the so-called estoppel certificate. There seems to be no dispute as to the background of this document or of Rapaport's knowledge of the pertinent facts at the time it was executed.
 
 
 38
 Rapaport was a New York attorney. In November, 1954, he secured an option from Eliot Hyman to acquire at forty cents on the dollar up to $250,000 of the interest Hyman had received from Rosen. Rapaport examined the duplicate originals of the five assignments from Kaufman to Rosen, and the affidavits executed by Kaufman in connection therewith. He was informed as to the amounts paid to Kaufman for each assignment, the details of the insurance taken out on Kaufman's life and other pertinent information. As Rapaport had full information as to all the details of the transaction, it is difficult to understand the contention that he relied on the affidavit which Rapaport prepared for Kaufman to sign, and which contained largely conclusions of law. We hold Kaufman was not estopped. Gaylord v. Commissioner of Internal Revenue, 9 Cir., 153 F.2d 408, 416; City of Chicago v. Joseph, 7 Cir., 95 F.2d 444, 446.
 
 
 39
 In the appeal of Arthur N. Pierson, et al., Appeal No. 12571, counsel make an unusual demand. They insist that this Court, in this opinion, should expressly state that the decision herein is without effect upon any and all rights of those assignees who are appellants in Appeal No. 12571.
 
 
 40
 The appellants in Appeal No. 12571, as is the case of appellants in Appeals Nos. 12572 and 12574, claim under assignments of Kaufman other than the five assignments which have been considered herein. We decline to render an advisory opinion of what, if any, effect our decision in the case at bar may have on litigation concerning assignments executed on other occasions and under other circumstances.
 
 
 41
 The judgment of the District Court dated November 12, 1958, is
 
 
 42
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Various aspects of this litigation have been before this Court in DeKorwin v. First National Bank of Chicago, 1946, 156 F.2d 858; DeKorwin v. First National Bank of Chicago, 1950, 179 F.2d 347; DeKorwin v. First National Bank of Chicago, 1956, 235 F.2d 156, and DeKorwin v. First National Bank of Chicago, 1959, 267 F.2d 337
 
 
 [2]
 On March 30, 1959, this Court held that the District Court had jurisdiction to supervise the termination and liquidation of said trust, 267 F.2d 337
 
 
 [3]
 The spendthrift clause provides: "The annuities given and the payments directed to be made by this will to my daughters and their issue are intended to provide for the comfortable support and maintenance of my daughters and their issue, and shall be paid over into the hands of said beneficiaries respectively, in person, and not upon any written or verbal order nor upon any assignment or transfer thereof by said beneficiaries, or by operation of law."
 
 
 [4]
 All assignments here under consideration used substantially the same language