Margaret DE KORWIN, etc., Plaintiff,

v.

FIRST NATIONAL BANK OF CHICAGO, etc., et al., Defendants.

FIRST NATIONAL BANK OF CHICAGO, etc., Petitioner,

v.

Graveraet Young KAUFMAN, Henry N. Rapaport, et al., Respondents.

No. 43 C 1043.

United States District Court
N. D. Illinois, E. D.

Nov. 12, 1958.

---

Charles Rivers Aiken, Richard F. Watt, Chicago, Ill., for claimant Graveraet Young Kaufman.

Thomas Hart Fisher, Norman Crawford, Hamilton Smith, Daniel M. Schuyler, Jay Stough, Jack A. Diamond, and McDermott, Will & Emery, Schuyler, Richert & Stough, Fischel, Kahn, Hart & Weinberg, Chicago, Ill., for claimants Henry N. Rapaport et al.

Weymouth Kirkland, A. Leslie Hodson, William B. McIlvaine, Clarence E. Fox, and Kirkland, Ellis, Hodson, Chaffetz & Masters, and Wilson & McIlvaine, Chicago, Ill., for trustee First Nat. Bank of Chicago.

IGOE, District Judge.

This cause now comes before the Court upon motions for summary judgment requiring disposition of another aspect of these proceedings.

The questions to be determined in this branch of the long and complex litigation relating to the Otto Young testamentary trust estate [1] arise out of certain dollar assignments made by Graveraet Young Kaufman, the settlor's oldest living grandchild. In earlier rulings of this court, Graveraet, as one of Otto Young's eighteen grandchildren, became vested under his grandfather's will with a one-eighteenth remainder interest in the corpus of the trust estate, subject to divestiture only in favor of his issue in the event he died before termination of the trust.[2] Time for distribution arrived when Graveraet's mother, Marie Julia Young Kaufman Pratt, the last life tenant, died on August 17, 1956. Were it not for the large number of claims that his assignees and subassignees had served upon the trustee, the First National Bank of Chicago,[3] Graveraet would have been entitled to the distribution in due course of his share in all of the trust estate then remaining in the hands of the Trustee.

Upon the death of Mrs. Pratt, the Trustee petitioned this court for instructions with respect to the many questions necessarily presented for determination in winding up the fifty-year old trust.

1. This litigation was commenced in 1943. Several phases of it have been decided by this court and by the Court of Appeals. De Korwin v. First National Bank of Chicago, 7 Cir., 156 F.2d 858, certiorari denied 329 U.S. 795, 67 S.Ct. 481, 91 L.Ed. 680; D.C., 84 F.Supp. 918; 7 Cir., 179 F.2d 347, certiorari denied 339 U.S. 982, 70 S.Ct. 1028, 94 L.Ed. 1386; D.C., 94 F.Supp. 577; D.C., 136 F.Supp. 720; 7 Cir., 235 F.2d 156; D.C., 155 F.Supp. 302.

2. D.C., 84 F.Supp. 918, affirmed, 7 Cir., 179 F.2d 347, certiorari denied 339 U.S. 982, 70 S.Ct. 1028, 94 L.Ed. 1386.

3. In a petition for instructions filed in this court on September 4, 1956, the Trustees alleged: "Four grandchildren of Otto Young—Graveraet Young Kaufman, Juliet Graveraet Kaufman de Manio, Marie Louise Kaufman Tonella Reaveley Burton Brill and Jane Kaufman Harding —have executed documents purporting to assign part or all of their remainder interests in the Trust Estate, copies of which have been served upon the Trustee. Other documents purporting to be subassignments executed by such assignees of such remainder interests have also been served upon the Trustee."

Among other things, the Trustee asked to file its accounts since the death of Otto Young's widow, in 1916;[4] it also requested the court to· determine what procedure it should follow in resolving the numerous conflicting claims to Graveraet's share. Until the Trustee's accounts had been stated and approved and unless the parties entitled to participate in Graveraet's share were judicially determined, the Trustee represented it would be impossible to carry out its obligation to divide and distribute the trust estate in equal shares among the testator's grandchildren [5] and thus terminate the trust.

As an essential step in the orderly division, distribution and termination of the trust, this court directed the Trustee to set up a special segregated account for Graveraet and for all claimants to his share, to be held subject to the further order of court. The Trustee has made distributions of the corpus into this segregated account from time to time, and the Trustee has, therefore, been able to divide the bulk of the trust estate remaining in its hands at the death of Mrs. Pratt, in consequence of which Graveraet's share and the shares of his three sisters (who also attempted assign-

ments) have continued under this court's control and supervision until the conflicting claims against them might be adjudicated.

A number of the assignees and subassignees asserting claims against Graveraet's share in the hands of the Trustee sought and were granted leave to intervene and press their claims in this cause. Among these was one Henry N. Rapaport, who affirmatively has asked this court to order the Trustee to distribute $247,750 to him in cash from Graveraet's share. Other claimants were brought in pursuant to this court's instructions to the Trustee;[6] such claimants have filed pleadings (as have the Trustee and Graveraet), thus delineating the factual and legal issues necessary to be determined before disposition can be made of Graveraet's segregated share.

The claims of Rapaport are derived from five assignments, made by Graveraet in 1951 and 1952, the dollar amount of which is $321,500. In addition to Rapaport, other persons claiming portions of these five assignments, and the amounts they claim, are as follows: Abraham Silberman, $12,000; Selma Lashine, $12,000; Maurice Kreis, $5,000; Alex Cohen, $4,000; Henry Legum,

---

4. The accounts of the Trustee were taken and settled in the Circuit Court of Cook County up to March 26, 1916, in a proceeding entitled First Trust & Savings Bank v. The Northern Trust Company, No. B–27575. The court's decree was entered on April 20, 1922. In the Trustee's petition for instructions filed in this court on September 4, 1956, it asked "that the Court authorize and direct the Petitioner to file in this proceeding, within sixty days from the date of the order, its statement of accounts showing the acts and doings as Trustee for the period from March 26, 1916, until the termination of the Trust, for such disposition as the Court shall direct."

5. In its petition for instructions of September 4, 1956, the Trustee alleged it was "now under a duty to divide the Trust Estate in equal shares between the grandchildren now living, the issue of any grandchildren who have died leaving issue surviving, and those persons taking by will or by descent from those grandchildren who are deceased and left no is-

sue surviving." After reciting the circumstances of the assignments which had been served upon it, the Trustee pointed out the necessity for construing the spendthrift clause and determining the possible effect of the assignments upon the titles "to the various parcels of real estate and to the leasehold interest conveyed by the Conveyance and Liquidation Trust Agreement * * *."

6. By this court's order of October 29, 1956, the Trustee was "ordered to file a separate petition herein, setting forth the names of the persons claiming interest in the shares of the Trust Estate of Graveraet Young Kaufman, Juliet Graveraet Kaufman de Manio, Marie Louise Kaufman Tonella Reaveley Burton Brill and Jane Kaufman Harding by assignment, subassignment, partial assignment or otherwise, and the nature of such claims, insofar as the Trustee has received notice of such persons and claims, and the Trustee is ordered to cause all such persons to be made parties defendant to this proceeding."

$15,750; and, Donald B. Jones, $25,000. All of these claimants, other than Legum (who has filed an appearance *pro se* but has not pleaded), have abandoned contentions originally asserted that the court was lacking in jurisdiction. Rapaport at no time raised a question with respect to jurisdiction.

In October of 1957, shortly after being given leave to intervene and plead, Rapaport filed a motion for summary judgment accompanied by affidavit asking the court to order that he be paid by the Trustee and the Liquidation Trustees [7] "the sum of $247,750, together with the income which has accrued thereon since August 17, 1956." By his motion Rapaport brought before the court for determination the validity and legal effect of the five assignments by Graveraet under which Rapaport took his dollar-amount subassignments. The original assignments were dated April 4, 1951, July 13, 1951, November 8, 1951, December 5, 1951, and April 4, 1952, and, as set out in the Trustees' petition of December 7, 1956, have been designated as GRAV–C, GRAV–E, GRAV–G, GRAV–H, and GRAV–I, respectively.

Thereafter, Graveraet filed his answer conceding many facts set forth in Rapaport's motion, an affidavit controverting certain facts, and a countermotion for summary judgment in his favor; Graveraet's countermotion seeks judgment not only against Rapaport but against the six other claimants mentioned. Certain matters set out in Graveraet's countermotion and supporting affidavit are the subject of counteraffidavits filed by

Rapaport and other claimants.[8] In addition to these motions and affidavits, the court also has before it rather elaborate pleadings and supporting documents, and a deposition given by Graveraet at the instance of Rapaport and other claimants.

The court has had the benefit of extensive written briefs as well as full oral argument. The parties concede there are sufficient uncontroverted facts to permit a summary judgment for Rapaport if his claim be lawful. Graveraet's counsel, in addition to urging the denial of Rapaport's motion for summary judgment as a matter of law (rather than on the ground that essential facts are controverted in good faith), has moved the court to find certain facts and to set down for trial limited factual issues in connection with Graveraet's contention that the assignment transactions are void as usurious loans, under Rule 56(d) of the Federal Rules of Civil Procedure, 28 U.S. C.A.[9] Quite apart from these issues, which might require proof, it is conceded that the court may properly determine on the motion and countermotion whether the spendthrift provisions in the will of Otto Young would bar the enforcement of Graveraet's assignments.

By reason of the voluminous record and the important issues to be decided, it is essential that the material facts which appear without substantial controversy be specified fully.

Otto Young, a resident of Illinois, died on November 30, 1906. His will, executed on December 5, 1905, was duly ad-

---

7. By a Conveyance and Liquidation Trust Agreement, dated November 14, 1951, and approved by this Court on December 14, 1951, the remaindermen (including Graveraet) conveyed their interests in the real estate and long-term leaseholds to certain Liquidation Trustees for the purpose of accomplishing "an orderly and expeditious liquidation of said properties at reasonable prices and without undue sacrifice and the efficient and economical management of said properties until such liquidation can be accomplished."

8. The affidavits filed by Selma Lashine, Alex Cohen, Abraham Silberman, Maurice Kreis, and Donald Jones are, to all intents and purposes, identical with those filed by Rapaport.

9. In their written brief and in oral argument, counsel for Graveraet asked the court to hear evidence on the following issues of fact: the life expectancy of Marie Julia Kaufman Pratt as of the various assignment dates, and the value of the shares assigned by Graveraet on those dates (as well as the value of the subassignments on the date when Rapaport acquired them).

mitted to probate in the Probate Court of Cook County, Illinois, on February 19, 1907. Marie Julia Kaufman Pratt, Otto Young's last surviving daughter, who was born September 8, 1877, died on August 17, 1956. Graveraet Young Kaufmann, Mrs. Pratt's first child, was born on November 1, 1900, and Graveraet's only child, Louis G. Kaufman, was born on January 3, 1931.

On April 4, 1951, July 13, 1951, November 8, 1951, December 5, 1951, and April 4, 1952, Graveraet signed writings, designated "assignments," in which he purported to grant, bargain, sell, assign, transfer, and set over to one Philip S. Rosen all of his right, title, and interest in and to the principal of the estate of Otto Young, deceased, to the extent of $62,500, $42,000, $42,000, $87,500, and $87,500, respectively. Copies of these documents are filed herein as Trustee's Exhibits GRAV–C, GRAV–E, GRAV–G, GRAV–H, and GRAV–I, respectively.

In each of these assignments, Graveraet warranted that his mother, Marie Julia Young Kaufman Pratt, was then 74 years of age, that upon his survival of her death he would become entitled to an interest in the principal of the Otto Young trust in excess of $1,000,000, and that his "assignment is intended as an outright sale and transfer absolutely and in fee simple of [his] interest in and to the principal of the trust estate herein assigned, and there shall be no obligation on [his] part personally to pay any sum beyond the application of [his] interest therein * * * that this sale and assignment are not made as collateral security for any price or amount, but that said sale and assignment are absolute and unqualified, and not subject to rescission and/or redemption * * * that [he has] not executed any promissory note or other indicia of personal liability, but that the recourse of Philip S. Rosen shall be against [his] interest in the aforesaid estate only." In each of the assignments Graveraet also warranted the number and amount of prior assignments made by him. The assignment dated April 4, 1951, warranted that he

had made prior assignment in the sum of $187,500. The assignment dated April 4, 1952, the last involved in the motion and countermotion, warranted that he had made prior assignments in the sum of $515,250.

Contemporaneously with the execution of the assignment dated April 4, 1951, Graveraet executed and delivered to Philip S. Rosen an affidavit stating that Graveraet had a specified interest in the testamentary trust established under the will of Otto Young, deceased; that he had executed an assignment to the extent of $62,500 to Rosen; that he had made certain specified prior assignments; that no judgment existed against him in Illinois in amounts in excess of $2,000, and that no suits or actions were pending against him, no receiver of his property had been appointed, and no proceedings in bankruptcy affecting his property had been commenced; and that he had "carefully" read the assignment of $62,500 to Rosen, knew its contents and knew that the only recourse of the assignee was against the trust. The affidavit also set out the facts of Graveraet's past and present employment as a banker, and asserted that the "assignment was negotiated for and executed pursuant to [his] request and of [his] own free will"; it stated that the affidavit was made to induce Rosen to "purchase" a portion of Graveraet's interest in the trust and to part with valuable consideration therefor and that the consideration paid in Graveraet's opinion was "fair and adequate in view of the hazards inherent in the transaction." With the other assignments, those dated July 31, 1951, November 8, 1951, December 5, 1951, and April 4, 1952, Graveraet executed and delivered to Rosen affidavits relating to such assignments identical with his affidavit of April 4, 1951.

For his assignment of $62,500, dated April 4, 1951, Graveraet received $15,000; for his assignment of $42,000, dated July 13, 1951, he received $10,075; for his assignment of $42,000, dated November 8, 1951, he received $10,000; for his assignment of $87,500, dated Decem-

ber 5, 1951, he received $20,000; and for his assignment of $87,500, dated April 4, 1952, he received $20,000. Thus, Graveraet received a total of $75,075 for his assignments aggregating $321,500.

All negotiations for these assignments took place in New York, and the assignments and the accompanying affidavits were executed in New York.

In connection with each of these assignments, applications for insurance on Graveraet's life were made; Philip S. Rosen acted and signed the applications as soliciting agent. All the insurance policies were issued for the benefit of Rosen; the original premiums were paid by Rosen; and all of the policies were immediately on their issuance assigned to Rosen by Graveraet. The amount of insurance taken out in connection with these five assignments ($159,000 in coverage) was determined by Rosen. Other than the amounts paid Graveraet and the insurance premiums, Rosen's only expense in obtaining the five assignments was a fee of $2,000 to his agent Edmund W. Bokat for legal services.

Philip S. Rosen made subassignments to one Eliot Hyman of his interest in the five assignments, as follows: On May 21, 1951, an undivided $29,500 in the assignment of $62,500, dated April 4, 1951; on July 23, 1951, all interest in the assignment of $42,000 dated July 13, 1951; on November 19, 1951, an undivided $26,250 in the assignment of $42,000 dated November 8, 1951; on December 19, 1951, all interest in the assignment of $87,500 dated December 5, 1951; and, on April 21, 1952, all interest in the assignment of $87,500 dated April 4, 1952. Copies of these subassignments have been filed herein as Trustee's Exhibits GRAV–C–5, GRAV–E–1, GRAV–G–1, GRAV–H–1, and GRAV–I–1, respectively. With these subassignments Hyman received, by way of assignment from Rosen, fourteen insurance policies on Graveraet's life, totalling $124,000 in coverage, which had been issued in connection with the original assignments.

Eliot Hyman assigned to Henry N. Rapaport all of his interest in the subassignments from Rosen with the exception of an undivided $25,000 in the subassignment of $87,500 dated December 19, 1951, by five separate sub-subassignments, executed December 6, 1954, copies of which have been identified and filed herein as Trustee's Exhibits GRAV–C–5–a, GRAV–E–1–a, Grav–G–1–a, Grav–H–1–b, and GRAV–I–1–a, respectively. The total face amount of interests thereby transferred from Hyman to Rapaport was $247,750. In connection with the five sub-subassignments to Rapaport, duplicate originals of the assignments from Graveraet to Rosen, of the affidavits signed by Graveraet, and of the subassignments from Rosen to Hyman, were exhibited to Rapaport. On December 15, 1954, Graveraet executed an affidavit in the presence of Rapaport stating that he ratified and reaffirmed his assignments to Rosen and the subassignments from Rosen to Hyman.

In addition to his subassignments to Hyman, Rosen made other subassignments, as follows: (1) of the assignment dated April 4, 1951, Rosen subassigned interests to the following persons: $4,000 to Alex Cohen on April 10, 1951; $12,000 to Selma Lashine on April 10, 1951; $12,000 to Abraham Silberman on April 10, 1951; and $5,000 to Maurice Kreis on April 23, 1951; (2) of the assignment dated November 8, 1951, Rosen subassigned an interest to the extent of $15,750 to Henry Legum on March 3, 1952. Copies of these subassignments have been identified and filed herein as Trustee's Exhibits GRAV–C–1, GRAV–C–2, GRAV–C–3, GRAV–C–4, and GRAV–G–2, respectively.

Hyman sub-subassigned to one Donald Jones an undivided $25,000 in the subassignment from Rosen to Hyman dated December 19, 1951. A copy of this sub-subassignment has been identified and filed herein as Trustee's Exhibit GRAV–H–1–a.

In consequence of various other assignments and reassignments of the insurance policies originally procured, and by virtue of taking out additional insur-

ance on Graveraet's life, the parties claiming a share of the five assignments described as Trustee's Exhibits GRAV– C, GRAV–E, GRAV–G, GRAV–H, and GRAV–I, obtained and maintained the following insurance on Graveraet's life:

| | Dollar Amount of Interest Claimed | Insurance Held on Life of Graveraet |
|---|---|---|
| Henry N. Rapaport (individually and as attorney to collect for Estate of Gustave Rubner, deceased) | $247,750 | $149,000 |
| Donald Jones | 25,000 | 15,000 |
| Henry Legum | 15,750 | 5,000 |
| Selma Lashine | 12,000 | 6,000 |
| Abraham Silberman | 12,000 | 6,000 |
| Maurice Kreis | 5,000 | 3,000 |
| Alex Cohen | 4,000 | 3,000 |
| Totals, | $321,500 | $187,000 |

In connection with the five subassignments from Hyman to Rapaport, Hyman agreed to and did assign to Rapaport insurance policies on Graveraet's life in the amount of $149,000, including ten insurance policies assigned in connection with the five subassignments from Rosen to Hyman.

The cost of certain insurance obtained for the five assignments by Graveraet was by terms of the policies subject to being reduced by their actual cash value. Cost of the policies was further subject to reduction by applying dividends against the premiums or (as in the case of one Maccabees insurance policy) by refunds in cash. The total of such reduction does not appear from the matters of record on these motions.

In calculating the amount of insurance to be procured for the five assignments from Graveraet to Rosen, the latter took into consideration, among other factors, the ages of Marie Julia Young Kaufman Pratt and of Graveraet, and the fair market value of the interests assigned to him by Graveraet at the time of their assignment.

Prior to the execution of the five subsubassignments from Hyman to Rapaport, dated December 6, 1954, Rapaport knew of the insurance policies taken out on Graveraet's life by Rosen and of his assignment of these policies to Rosen. He received his knowledge in November of 1954 from one Edmund W. Bokat, who had acted as Rosen's agent and lawyer, and who was then acting as Hyman's attorney. Rapaport also knew how much Rosen had paid Graveraet for the five assignments; Graveraet's warranties and affidavits given in connection with the assignments; the language and provisions in each of the assignments, warranties and affidavits; and Mrs. Pratt's and Graveraet's age at the time of each assignment.

Rapaport was also aware that assignors have often contended in court that transactions similar to these were in fact loans and not sales. Rapaport, a lawyer, had read legal decisions where such contentions had been made.

Rapaport had nothing to do with negotiations for the assignments dated April 4, 1951, July 13, 1951, November 8, 1951,

December 5, 1951, and April 4, 1952 nor with their execution. Likewise no agent or attorney of his had any such connection. Mr. Rosen and his attorney, Bokat, had no dealings of any kind with Rapaport until the year 1954. In November of 1954 Rapaport informed Bokat, then acting as attorney for Hyman, that unless he received a statement from Graveraet ratifying and reaffirming his assignments to Rosen and Rosen's subassignments to Hyman, consenting to the proposed subassignments by Hyman to Rapaport, and representing that all of Graveraet's assignments to Rosen were valid and subsisting and that Graveraet had no defense, offsets, or counterclaims to them, he would not purchase Hyman's interest in such assignments. Prior to December 15, 1954, Bokat, as Hyman's attorney, so advised Graveraet.

The five assignments executed by Graveraet were prepared by Rosen or his agent or attorney. Neither Graveraet nor anyone representing him participated in the preparation of these documents, nor did Graveraet see any of the assignment papers before he executed and delivered them to Rosen.

On April 4, 1951, Graveraet's life expectancy was 23.26 years and his son's was 49.47 years; on July 13, 1951, November 8, 1951, December 5, 1951, and April 4, 1952, their expectancies were 22.48 and 48.55 years, respectively; on December 6, 1954, they were 20.21 and 45.83 years.

As a young man Graveraet had studied at the American Institute of Banking. He then became associated with the Chatham-Phoenix Bank of New York City, in which his father was prominent. After working in various departments of the bank, Graveraet became vice-president in charge of a branch office. In such capacity he served on the discount committee, which considered loans and other banking matters. He ceased his connection with the Chatham-Phoenix Bank in 1932 or 1933; thereafter he had a series of positions with other banks and brokerage firms. There also appear to have been substantial periods during which Graveraet was not gainfully employed. In 1946 he became associated with the Trade Bank and Trust Company in New York, remaining until 1951; his functions and compensation at that bank were quite modest.

For a number of years Graveraet received $1,000 a month from his mother, Mrs. Pratt, who was receiving nearly a fourth of the large Otto Young trust income. In addition, Mrs. Pratt helped out in supporting Graveraet's wife and son. When Mrs. Pratt learned, in 1950 or 1951, that Graveraet had made certain assignments—such as the five assignments here involved—she discontinued her payments to him.

In the fall of 1950, prior to his transactions with Rosen, Graveraet was unsuccessful in borrowing from a commercial bank, with his remainder interest in the Otto Young trust estate to be used as security. Upon first meeting Rosen, Graveraet indicated he wanted to borrow or obtain an advance against his remainder interest. Rosen informed Graveraet that insurance would be vital to any such transaction, and they discussed the sale of a portion of Graveraet's interest in the Otto Young trust. At the time Graveraet signed the various documents in question he believed the representations and warranties in them were correct. Afterward, by notice to the Trustee and by his pleadings in this cause, he disaffirmed the assignments, asserting their legal invalidity upon a number of grounds.

These facts recount a social and legal problem that has plagued civilizations and courts at least since the days of the Roman Empire. Every society, at one time or another, has been faced with the task of protecting its financially necessitous citizens from the unscrupulous. In primitive societies, where goods were produced for immediate consumption only, it was considered unfair if a lender demanded compensation for the use of his goods or money, and the exaction of any interest as the condition of a loan was regarded as illegal under the name

of usury.[10] Later, when goods were produced for the profitable purpose of making more goods, the law permitted the lender to take reasonable compensation for a loan. Consequently, the concept of usury was modified to prohibit only those interest charges which were in excess of a specified maximum rate. The permissible rates have varied in different societies, as have the penalties imposed.[11] Even now, the laws of various States permit different rates and contain sanctions varying from loss of the usurious interest to forfeiture of all interest and principal.[12]

In addition to the protection of the usury statutes, special measures were devised in light of the peculiarly vulnerable position of expectant heirs, remaindermen, and reversioners. The Roman Emperors endeavored to protect the *filius familias* by prohibiting any action or claim on account of a loan made to him which was to be repaid upon the death of the *pater familias*.[13] In England, the courts of chancery gave relief against what were termed catching bargains and *post obit* contracts, or unconscionable sales of interests by heirs, remaindermen and reversioners. These equitable doctrines supplemented the more traditional protection of the usury laws.[14]

In this country, heirs, remaindermen, and reversioners have long had available to them the provisions of various State usury laws. For example, in New York (where the assignments here involved were executed), the maximum rate of legal interest is six percent, and any loan or forbearance at a higher rate of interest is wholly void.[15] American courts, however, have been reluctant to employ the doctrines developed by the English jurists.[16] Instead, our courts have evolved an impressive body of law upholding so-called spendthrift clauses, thereby making enforceable the intention of testators and trust settlors to restrict the right of beneficiaries to alienate their interests. It is significant that spendthrift trusts had their origin and early growth in the United States during the very period when the concepts of catching bargains and *post obit* contracts were being viewed with increasing skepticism.[17]

In Illinois, where Otto Young resided and executed his will, the spendthrift trust had received full judicial approval in Steib v. Whitehead, 111 Ill. 247. The doctrine of the Whitehead case subsequently became so firmly imbedded in the law of this State it is safe so say that Illinois is among those jurisdictions

---

10. The Hebrews, for example, did not permit any interest to be charged on money lent. See Leviticus 25:35–37, and Deuteronomy 23:19–20.

11. See, generally, Ryan, Usury and Usury Laws (1924), at pp. 37–47.

12. Thus, in Illinois, the penalty for usury is forfeiture of all interest. Ill.Rev.Stat. Chap. 74, Sec. 6. In New York, by contrast, the entire transaction is void, and the usurer loses his principal as well as any interest. McKinney's Consol.Laws N.Y.Ann. c. 20, General Business Law, § 373.

13. This enactment, of about 50 A.D., was known as the *Senatus Consultum Macedonianum*, so denominated either after Macedo, a well-known usurer, or after Macedo, a young debauchee. Bellot, The Legal Principles and Practice of Bargains with Money-Lenders (2d ed., 1906), at p. 110.

14. See the 1750 opinion of Lord Chancellor Hardwicke in Earl of Chesterfield v. Janssen, 2 Vesey (sr.) 125, 153. Even after the usury statutes had been repealed in England by the middle of the 19th Century, the equitable protections remained. See Beynon v. Cook, L.R. 10 Ch.App. 389, 392, in which Sir G. Jessel, M.R., held that "the repeal of the usury laws does not make a hard bargain with an expectant heir reasonable * * *".

15. McKinney's Consol.Law N.Y.Ann., General Business Law, §§ 370, 373.

16. The opinion of Judge Learned Hand in Provident Life & Trust Co. v. Fletcher, D.C., 237 F. 104, 108–111, reflects this tendency upon the part of the American courts.

17. Griswold, Spendthrift Trusts (2d ed., 1947), at pp. 2–33.

where such trusts enjoy the greatest degree of judicial approval.[18]

Inasmuch as the questions of law presented for determination by both Rapaport's motion and Graveraet's counter-motion for summary judgment are substantially the same, they may be discussed and resolved without the necessity of treating them separately insofar as they relate to such motion and counter-motion. The impact of the spendthrift provisions in Otto Young's will on the five assignments here involved can be decided on the facts which have been set out, and this problem ought therefore to be first examined.

Graveraet contends that the five assignments before the court are barred by the following express language of the Sixth Article of Otto Young's will: "The annuities given and the payments directed to be made by this will to my daughters and their issue are intended to provide for the comfortable support and maintenance of my daughters and their issue, and shall be paid over into the hands of said beneficiaries respectively, in person, and not upon any written or verbal order nor upon any assignment or transfer thereof by said beneficiaries or by operation of law." Rapaport asserts that the court has already determined this clause applies only to income, not to corpus; he argues further that, assuming the question to be still open for decision, the language of the clause discloses an intention to limit its protection to income.

Thus it becomes immediately necessary to consider whether the question was previously decided. If this court has determined that the spendthrift clause applies only to income and not to corpus, it would have had to be by certain language in its opinion of May 19, 1949.[19]

Rapaport and the other claimants contend the court necessarily determined that the spendthrift clause applies only to income, because had it interpreted the clause as also applicable to corpus it would have had to decide whether, under Illinois law, a remainder controlled by such spendthrift clause can be vested rather than contingent. On the other hand, it is urged by counsel for Graveraet that the matters earlier before the court, as set out in the pleadings, presented no issue as to the scope of the spendthrift clause and could not have, that the court was not required to pass upon this question in order to reach its decision that the remainders were vested subject to divestiture, and that no assignments by any remainderman could then have been involved. Graveraet, therefore, maintains that the court may properly regard its prior language merely as dictum, and not controlling upon the present controversy.

It is true that in 1949 counsel for the Trustee and for the plaintiff discussed in their arguments to the court the sig-

---

18. Cf. Danning v. Lederer, 7 Cir., 232 F. 2d 610; Wagner v. Wagner, 244 Ill. 101, 91 N.E. 66; Hopkinson v. Swaim, 284 Ill. 11, 119 N.E. 985; Congress Hotel Co. v. Martin, 312 Ill. 318, 143 N.E. 838, 33 A.L.R. 562; McKeown v. Pridmore, 310 Ill.App. 634, 35 N.E.2d 376.

19. "There is urged in behalf of some of the defendants a general purpose of the testator to keep the estate in his lineal descendants. That this is true must be conceded no more than it has to be in any case where lineal descendants are designated as the primary takers of property with a substitutionary gift to their issue. Every such disposition indicates a like purpose, and to be satisfied it does not require that the gift to the primary takers be held contingent.

If this were not so, nearly all the decisions cited earlier would have to be rejected. These cases carry out that purpose to the full measure of the testator's intention as he has expressed it. The leaning upon the spend-thrift trust clause by counsel for the Bank, in this connection, affords no support for its position. The testator when inserting this clause in the income gifts was concerned only with protection of the income beneficiaries against creditors. *And if, as the Bank contends, the testator had a different purpose in mind, the absence of a spend-thrift clause from the gifts of corpus is not without significance as supporting the plaintiff's position.*" (Emphasis supplied.) 84 F.Supp. 918, 929, 930.

nificance of the language in the spend-thrift clause. But it does not appear the Trustee asserted that if the spendthrift clause applied to corpus the remainders could not be vested but had to be contingent. Rather, the Trustee urged in this respect merely that the controlling consideration was the testator's intention, and that in finding such intent his entire will had to be considered, not simply one portion of it viewed separately. Actually, counsel for the Trustee recognized and expressly conceded that "the existence of a spendthrift clause applicable to a gift of corpus does not of itself render such a gift contingent upon survivorship."[20]

In any language seeming to intimate a view that the spendthrift clause was limited to income, the court was not there passing upon a contention that application of a spendthrift clause to corpus bars vesting of the remainders and that the remainders must, therefore, be contingent. No such argument was made. Furthermore, it is not open to serious question that in Illinois a spendthrift clause may be applicable to corpus, and thus to remainders, and yet such remainders can be vested rather than contingent. Cf. Von Kesler v. Scully, 267 Ill. App. 495, recently cited in Danning v. Lederer by the Court of Appeals for the Seventh Circuit, 232 F.2d 610, 612.

The reliance of Rapaport and the other claimants on the so-called "personal receipt" language of the spendthrift clause and upon Routt v. Newman, 253 Ill. 185, 97 N.E. 208, First National Bank of Chicago v. Cleveland Trust Co., 308 Ill. App. 639, 32 N.E.2d 964, and Cowdery v. Northern Trust Co., 321 Ill.App. 243, 53 N.E.2d 43, is misplaced. Those decisions do not reflect an established rule that a "personal receipt" spendthrift clause applicable to corpus necessarily renders the remainders contingent, that is, contingent upon survival to take. Moreover, as argued at length by Rapaport and the other claimants, the rationale of those decisions is based upon the holding in Routt v. Newman that income accrued but not paid prior to the death of an income beneficiary cannot go to his personal representative inasmuch as the personal receipt clause requires the beneficiary to be alive in order that he will receive in person. But such doctrine has been expressly determined as inapplicable to the Otto Young trust. The decree of the Circuit Court of Cook County, of April 20, 1922, in First Trust and Savings Bank v. Northern Trust Co., No. B–27575, ordered and decreed that the Trustee under the will of Otto Young should pay to the personal representative any income accrued but not paid prior to the death of an income beneficiary.[21] As the accounts of the Trustee on file herein indicate, the Trustee has followed these instructions upon the several occasions when income beneficiaries have died,[22] the Trustee's practice in this regard has never been called into question, and is the settled law of the case.

It thus appears the irrelevance of Routt v. Newman with respect to the spendthrift clause in Otto Young's will had already been adjudicated when this court undertook to decide whether the

20. At this point counsel for the Trustee was quoting from a pocket supplement to Carey and Schuyler, Illinois Law of Future Interests (1941) Sec. 338; virtually the same language is to be found in the 1954 Cumulative Pocket Part, at p. 199.

21. The prayer for relief of the First Trust and Savings Bank, as Trustee, in its complaint filed on December 27, 1916, asked the court to "examine into and determine the correct method of computing the net income derived in each year from the trust estate * * * for the purpose of determining in each year the amount of income to which the said daughters of Otto Young, and their descendants, are entitled from and after the death of said Ann Elizabeth Young * * * *"

22. Thus when Otto Young Heyworth, oldest grandchild of Otto Young, died in 1936, a substantial amount of accumulated income was paid to his administrator; the same thing happened when Stanley Young, another grandchild, died in 1940.

remainders were vested or contingent. Had the 1922 decree been then specifically called to the court's attention (insofar as that decree was directly at odds with the holding and, of necessity, the rationale of Routt v. Newman and the later decisions citing it), the court could not have considered the legal significance of the spendthrift clause either as open to decision or available for argument upon the vested or contingent character of the remainder.

Consideration of the 1922 decree, as it relates to this problem has been had now for the first time, when the application of the spendthrift clause to corpus is squarely before the court for decision. If generalizations by the court in its 1949 opinion seem beyond that which was necessary in this respect then to decide, the court had before it at that time neither the present claims and arguments, the applicable authorities, nor the binding quality and character of the 1922 decree.[23] The application of the spendthrift clause to corpus is, therefore, not controlled by the 1949 decision.

In considering this question, the court has carefully reviewed not only its own opinion of May, 1949, but the following opinion of the Court of Appeals as well, which affirmed that the remainders were vested and not contingent.[24] It is not without significance then that in writing a comprehensive exposition of the law determining that the remainders were vested, the Court of Appeals made no mention of the spendthrift clause. The conclusion is inevitable that a construction of the spendthrift clause was neither necessary nor appropriate to a disposition of the issues before the court in 1949.

■ It is incumbent upon the court, then, to ascertain what was the testator's intention inasmuch as the spendthrift clause, placed in the Sixth Article of the will where the gifts of corpus are made, is not free from doubt. The intent of the testator must govern, of course, and in seeking that intention, not only must the entire will be considered, but the court may properly take into account the purpose of the instrument, the motives which reasonably might have influenced the testator in the disposition of his property, the circumstances and surroundings prevailing at the time the will was executed, and the ties connecting the testator with the objects of his bounty. Whittington v. Hunt, 296 Ill. 133, 129 N.E. 543; Wardner v. Seventh Day Baptist Memorial Board, 232 Ill. 606, 83 N.E. 1077; Abrahams v. Sanders, 274 Ill. 452, 113 N.E. 737; Rettig v. Zander, 364 Ill. 112, 4 N.E.2d 30; Maddock v. Haines, 7 Cir., 88 F.2d 350, 112 A.L.R. 279. "The court may place itself in the position of the maker * * *" La Rocque v. Martin, 344 Ill. 522, 525, 526, 176 N.E. 734, 735.

■ Endeavoring to place itself, so to speak, in Otto Young's armchair,[25] the court regards as of importance that Otto Young intended to create a trust to endure as long as the rule against perpetuities will permit.[26] Considering the ages

23. In Cohens v. Commonwealth of Virginia, 6 Wheat. 264, 399–400, 5 L.Ed. 257, 290, Mr. Chief Justice Marshall observed: "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason for this maxim is obvious. The question actually before the Court is investigated with care and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated." This language was recently quoted in United States v. Zuskar, 7 Cir., 237 F.2d 528, 532.

24. De Korwin v. First National Bank of Chicago, 7 Cir., 179 F.2d 347.

25. Cf. Abrahams v. Sanders, 274 Ill. 452, 456, 113 N.E. 737.

26. First Trust and Savings Bank v. Northern Trust Co., No. B–27575, Circuit Court of Cook County, opinion of the court.

of his daughters and grandchildren living in 1905, Otto Young could reasonably have anticipated that his trust would last for fifty years,[27] and that his older grandchildren at least would be in their forties and fifties before its termination. As it has turned out, the oldest living grandchild, Graveraet Young Kaufman, was nearly fifty-six years old when his mother, the last of Otto Young's daughters, died and the time for distribution arrived. The testator was an experienced businessman who had amassed a large fortune. It is hardly conceivable, therefore, that he did not recognize the temptations to which, in the ordinary course of events, his grandchildren would be exposed. At the time he executed his will, in 1905, Otto Young had seven grandchildren, and his four daughters were all of child-bearing age, the oldest being thirty and the youngest, twenty-four. The testator could reasonably have looked forward to the birth of additional grandchildren. He certainly could have anticipated that some of them would be improvident and others might not wish to wait until the time for division and distribution had arrived. Furthermore, he could have reasonably anticipated that the children of the last daughter to die, unlike the others, would not be receiving trust income from the Trustee, even though they were well into middle age.

Looking to the future, then, and mindful of the evil spendthrift clauses were intended to prevent, Otto Young must have known that his long-term testamentary trust would inevitably place at least some of his grandchildren in that vulnerable position which heirs, remaindermen, and reversioners have long been recognized to occupy. For the testator not to have meant to protect his grandchildren against voluntary or involuntary disposal of their equitable interests by absolute sale or otherwise is hardly credible. In order to protect all of his grandchildren (not just those who would become income recipients in their mother's stead), the testator must have intended his spendthrift language to encompass principal payments as well as gifts of income.

Obviously to emphasize this intention, the testator placed his spendthrift language in the middle of Article Sixth immediately after the paragraph providing for ultimate division of the corpus. Had it been designed solely to inhibit the anticipation of income, as Rapaport argues, the spendthrift language would have been placed in the Fifth Article (relating to income), rather than in the Sixth Article (relating to corpus).

Furthermore, the testator desired to accomplish the growth of his trust estate by accumulating a part of the income, as the Circuit Court of Cook County observed, in determining Otto Young's intention, when it construed the will in 1922: "First of all, he provided that the corpus of his estate should endure for the longest possible period permitted by the rule against perpetuities. In the next place, he provided that excess of income should be carried with the corpus of the estate for the same period. He intended that his estate should grow and accumulate, from the time of his death until the time for ultimate distribution, to the utmost extent consistent with the provisions for the comfortable support and maintenance of his widow and daughters."[28]

Since Otto Young's death, millions of dollars have been added to the principal of the trust estate, as he clearly intended.[29] Thus the remaindermen were ultimately to divide among themselves a

27. First Trust and Savings Bank v. Northern Trust Co., No. B–27575, Circuit Court of Cook County, transcript of testimony of Joseph H. Nitchie before Master Sigmund Zeisler; Master's Report, at 48; Decree of April 20, 1922.

28. First Trust and Savings Bank v. Northern Trust Co., No. B–27575, Circuit Court of Cook County, opinion of the court.

29. The accounts of the Trustee filed herein disclosed that from the death of Otto Young's widow, on March 26, 1916, to August 17, 1956, approximately five million dollars ($5,000,000) were added to corpus in accordance with the provision

corpus which had been systematically augmented over a long duration of the trust. To hold back protected income in order for the ultimate takers to benefit would be useless if it were not also made certain that these remaindermen would receive their shares of the principal, so carefully enhanced, intact.

■ Finally to insure that his beneficiaries would receive the full protection afforded by a spendthrift clause, Otto Young employed almost verbatim the spendthrift language approved in the leading case of Steib v. Whitehead, 111 Ill. 247, the fountainhead of spendthrift trusts in Illinois.[30] In adopting the Whitehead spendthrift clause, the testator is presumed to have been cognizant of the broad policy considerations of the Illinois Supreme Court in upholding it: "Yet a trust, however carefully guarded otherwise, would in many cases fall far short of the object of its creation, if the father, in such case, has no power to provide against the schemes of designing persons, as well as the improvidence of the child itself. If the beneficiary may anticipate the income, or absolutely sell or otherwise dispose of the equitable interest, it is evident the whole object of the settlor is liable to be defeated. If, on the other hand, the author of the trust may say, as was done in this case, the net accumulations of the fund shall be paid only into the hands of the beneficiary, then it is clear the object of the trust can never be wholly defeated. Whatever the reverses of fortune may be, the child is provided for, and is effectually placed beyond the reach of unprincipled schemers and sharpers." Steib v. Whitehead, 111 Ill. 247, 251, 252.

Significantly, the assignments themselves reflect a recognition by Graveraet and Rosen that the spendthrift clause could prevent the assignees from compelling the Trustee to make payment directly to them. One of the paragraphs in the assignment of April 4, 1951 (GRAV–C), and in each of the other assignments, provided that "if the said sum * * * herein assigned to Philip S. Rosen is paid to [Graveraet] by operation of law or by reason of the trustees' failure or refusal to pay the said sum directly to Philip S. Rosen or his heirs, executors, administrators and assigns, or if for any reason whatsoever the said sum shall come into [Graveraet's] hands, then and in such case, [Graveraet] shall hold the said sum in trust for the benefit of Philip S. Rosen, and forthwith pay the said sum over to him without further demand or direction."

The spendthrift clause, it is thus seen, does not in and of itself render the transactions invalid or void entered into between Graveraet and Rosen. It does require though that the Trustee pay Graveraet's share directly to him; at that point, however, if the assignments are otherwise valid and enforceable, the provisions of the assignment instruments causing Graveraet to hold his distribution as trustee come into operation.

■ The court concludes for these reasons that the relief sought by Rapaport cannot be granted, and his motion for summary judgment must, therefore, be denied. In so ruling the court does no more than hold that Otto Young's spendthrift clause precludes the enforcement of any assignment or instrument purporting to transfer all or part of a remainder interest by a direction that the Trustee shall pay such assigned or transferred amount to the assignee or transferee. This duty of the Trustee is prescribed by Otto Young's will. The Trustee must make payment directly into the hands of the remainderman; it may not pay anything (income or principal) to an assignee or a transferee.

Savings Bank v. The Northern Trust Company, No. B–27575, Circuit Court of Cook County.

of the will that twelve percent of the annual income be so accumulated. From 1906, when Otto Young died, until March 26, 1916, the income added to corpus amounted to slightly more than two and one-half million dollars ($2,500,000). Decree of April 20, 1922, First Trust and

30. Congress Hotel Co. v. Martin, 312 Ill. 318, 321, 322, 143 N.E. 838, 33 A.L.R. 562.

■■ The question remains as to the validity of the assignment transactions for, even though the assignees cannot compel payment by the Testamentary Trustee, they may still seek satisfaction of their claims out of the funds when they have reached Graveraet's hands, assuming their assignments are to that extent enforceable. It is strongly contended by Graveraet's counsel that the assignments though couched in the language of sales are in fact usurious loans. The assignments were executed in New York and, as all counsel agree, New York law governs them. Consequently, if the assignments amount to usurious loans they are void, and this court should enjoin their enforcement and order them to be surrendered up and cancelled.[31]

■ Where the defense of usury is raised in this type of transactions, the form in which the parties have cast their dealings is not, of course, controlling. In re Reif's Will, Sur., 30 N.Y.S.2d 47. "It was early recognized by the courts that, if the form of the contract were to be controlling, the statute against usury would be substantially unenforceable, and thus it was made the duty of the court in each case presented to examine into the substance of the transaction between the parties and determine whether the intent which pervaded it was one which violated the statute." Hall v. Eagle Insurance Co., 151 App.Div. 815, 136 N.Y.S. 774, 782, 783, affirmed 211 N.Y. 507, 105 N.E. 1085. Under the New York law, therefore, the question of whether these assignments amounted to sales or loans at a usurious rate of interest is to be determined not by the language in the assignment instruments but by the intention of the parties.

■ In New York, usurious intent is not based upon a finding as to the subjective intention of the parties, but rather on determination as to the effect of the transaction itself. The intent which will violate the statute is a general one, not a specific intent. A transaction may constitute usury even though the parties did not specifically intend to provide for usurious interest. It is sufficient that a consequence of the transaction is exaction of interest greater than what the law allows.

In Fiedler v. Darrin, 50 N.Y. 437, 443–444, the court, in discussing the nature of usurious intent at length, used the following decisive language: "The agreement was vicious because of the usurious effect, by which the intent of the parties must be judged * * *. It is true the intent is essential to constitute the offense of usury; but the intent must be deduced from and determined by the acts * * *. If the party intends to take and receive the amount paid, the law condemns the act, if it is within the condemnation of the laws against usury. The offense is not condoned by the want of an intent to violate the statute, or by an attempt to evade the statute by a resort to any of the devices of which usurers have in all ages been so prolific, and which have always proved so abortive of the hoped for results. The question, therefore, to the plaintiff as to his intent to take more than seven percent per annum for the loan or forbearance of money, was properly excluded. An answer either way could not have changed the facts. * * * [32]

■ Where the difference between the amount paid the remainderman plus the maximum legal rate of interest is only

---

31. McKinney's Consol.Laws N.Y.Ann., General Business Law, §§ 370–373, 377.

32. The court further observed: "There are cases in which an act is lawful or unlawful, depending upon the particular intent of the actor. In such cases, it is competent to prove the motive and intent of the party. * * * The intent in such case is a material fact in issue. * * * So when an act is equivocal in its character, the intent must be ascertained in order to give it its proper effect, and assign it its proper place in the transaction. * * * But when an act is illegal the intent of the offender is immaterial. It will not avail one, who deliberately fires his neighbor's house, to swear that he did not intend to commit arson; and one who deliberately and intentionally secures to himself $1,650 at the end of four months,

"somewhat" less than the amount to be paid the assignee, the court should determine the specific or particular intention of the parties. Fiedler v. Darrin, 50 N.Y. 437; Hartley v. Eagle Insurance Co., 222 N.Y. 178, 118 N.E. 622, 3 A.L.R. 1379; Brown v. Robinson, 224 N.Y. 301, 120 N.E. 694, 21 A.L.R. 777. But the court is not to inquire as to specific intent where "the interest payable [is] so large that, in view of all the circumstances, an intent to provide for the payment of interest beyond the legal rate will necessarily be imputed to them. Fiedler v. Darrin, 50 N.Y. 437." Hartley v. Eagle Insurance Co., 222 N.Y. 178, 187, 118 N.E. 622, 625.

In considering the assignment transactions before the court, a "view of all the circumstances" shows them to be quite similar to those which have been passed upon in numerous New York Appellate Division, Court of Appeals, and Federal District and Court of Appeals decisions where it was held that assignments in the form of sales were usurious loans.[33] Of special significance is the fact that as an integral part of each transaction the assignee procured insurance on the life of Graveraet and had the policies assigned to himself. The purpose of the life insurance was to eliminate the hazard that Graveraet might predecease his mother, leaving issue him surviving. In Brown v. Fletcher, D.C., 244 F. 854, 862, the court dismissed the subassignee's complaint on the ground of usury where the assignee had insured the life of the assignor: "The money lenders here were protected from all loss under all possible circumstances; they were sure to have the principal repaid. This the policies of insurance gave to them." Indeed, so frequently have New York

money lenders attempted to cloak usurious loans to remaindermen as sales while protecting themselves from loss through the use of life insurance, that in holding the assignments in Mercantile Trust Co. v. Gimbernat, 134 App.Div. 410, 119 N.Y.S. 103, 105, to be usurious loans and not sales, the court said: "The devices and methods by which it was sought to cover up the real nature of the transactions have been used many times before, and have seldom, if ever, successfully passed the scrutiny of the courts. They have not even the merit of novelty or of plausibility."

Accordingly, if the assignments are to be taken literally, that is, as assignments and sales of portions of Graveraet's remainder interest, under the New York decisions this court should determine whether the dollar-amounts assigned are so large in comparison with the sums paid to Graveraet plus other costs of the transaction, including insurance premiums, that "an intent to provide for the payment of interest beyond the legal rate will necessarily be imputed" to the parties. Hartley v. Eagle Insurance Co., 222 N.Y. 178, 187, 118 N.E. 622, 625.

In support of his countermotion for summary judgment, Graveraet has attached the affidavit of Edward D. Brown, Jr., a consulting actuary. Brown affirms as his professional opinion that at the time of the assignment dated April 4, 1951, Mrs. Pratt had a life expectancy of 8.46 years, and that at the time of the other four assignments here involved she had a life expectancy of 7.99 years. Brown also deposes his opinion that, in view of the life expectancies of Mrs. Pratt, Graveraet, and Graveraet's son (thereby taking into account the possi-

in return for a present advance of $1,500, cannot avoid the consequences of the act by testifying that he did not intend to take usury; that is, that he intended to give the transaction a different name from that which the law gives it, and *call that a purchase and sale which the law calls a loan of money*, secured by mortgage." (Emphasis supplied.)

**33.** Mercantile Trust Co. v. Gimbernat, 134 App.Div. 410, 119 N.Y.S. 103; Wetzlar v. Wood, 143 App.Div. 311, 128 N.Y.S. 501, affirmed 214 N.Y. 639, 108 N.E. 1111; Otten v. Freund, 150 App.Div. 434, 135 N.Y.S. 59; Leavitt v. Enos, 155 App.Div. 584, 140 N.Y.S. 862; Brown v. Fletcher, D.C., 244 F. 854, affirmed, 2 Cir., 253 F. 15; In re Reif's Will, Sur., 30 N.Y.S.2d 47.

bility that Graveraet might predecease his mother leaving his son surviving), the value of each of the five assignments as of the time they were made was as follows: GRAV–C, $36,450; GRAV–E, $25,034; GRAV–G, $25,034; GRAV–H, $52,154; and GRAV–I, $52,154. Thus, according to affiant Brown, Graveraet made assignments of interest having a total value of $190,826. For these, Graveraet received $75,075 from Rosen, or approximately forty percent of the value shown by Brown's affidavit.

Another method for determining the extent of disproportion between the dollar amounts assigned and the sums received by Graveraet is to total Rosen's costs during Mrs. Pratt's life expectancy and compare them with the total amount assigned. Rosen paid Graveraet $75,075 for the five assignments. He also had expenses totalling $2,000 and would have to pay insurance premiums of $5,172 a year for the $154,000 of insurance he procured on Graveraet's life. Accepting affiant Brown's opinion as to Mrs. Pratt's life expectancy, Rosen would pay the $5,172 annual premium for 8.46 years, a total of $43,761.[34] Totalling these figures, it appears that Rosen was to receive $321,500 out of Graveraet's remainder interest for a total payment of $120,836. In short, by this method of calculation, Graveraet received approximately thirty-eight percent of the value of the interest he assigned.

Thus, notwithstanding the form of the assignments as sales of dollar-amounts in Graveraet's remainder interest, it would have to be concluded upon Brown's affidavit and the uncontroverted facts concerning Rosen's expenses that an intent to provide for interest beyond the

legal rate is imputable to the parties. However, Rapaport and the other claimants have submitted affidavits of Frank L. Griffin, Jr., a consulting actuary, and of Samuel A. Cohen, a party to this proceeding, in opposition to Graveraet's countermotion for summary judgment. These affidavits require analysis to determine whether they so controvert Brown's affidavit as to require a trial as to material facts.

Cohen's affidavit states the value of the dollar-amounts assigned at the time of assignment was between twenty percent and twenty-four percent of their face. Cohen, however, is an interested party since he is an assignee of one of Graveraet's other assignments. Furthermore, his affidavit provides no indication of the foundation for his opinion except, possibly, his assertion that he has engaged in similar transactions. Consequently, it is not at all plain whether Cohen's affidavit, standing alone, raises any genuine controversy as to a material fact.

The affiant Griffin disagrees with deponent Brown regarding the appropriate actuarial table to be used in estimating Mrs. Pratt's life expectancy. He prefers to use other tables, at least one of which appears to have been published subsequent to the assignments. But even if Mrs. Pratt did have a life expectancy of 11.39 years at the time of assignments (the longest life-expectancy suggested by Griffin), Rosen's costs would aggregate less than $136,000 or approximately forty-two percent of the total interest assigned.[35]

Using these same tables, Griffin estimates there was roughly one chance in five, or one chance in four of the "com-

34. Since Mrs. Pratt's life expectancy was only 7.99 years at the time of the last four assignments, and since all of the insurance was not procured at the time of the first assignment, Rosen would in fact pay somewhat less than a total of $43,761.

35. This total is arrived at by adding the amount Rosen paid to Graveraet for the five assignments, the $2,000 in expenses,

and the annual insurance premium multiplied by 11.39. However, since even according to this table, which apparently was not published until after the date of the last assignment, Mrs. Pratt's life expectancy was only 10.78 years at the time of the last four assignments, and since all the insurance was not procured at the time of the first assignment, Rosen would in fact pay less than a total of $136,000.

bined probability", that Graveraet would predecease Mrs. Pratt or that Mrs. Pratt would live so long that Rosen would receive six percent or less on his investment. Aside from it being but another way of saying that the chances were three out of four or four out of five Rosen would receive a return of more than six percent, this approach has never been looked upon favorably by the New York courts in determining whether the disproportion between the amount assigned and the amount to be received is so great that usurious intent is imputable.

Finally, Griffin states there was great possibility that distribution to the assignee would be delayed, that the assignee might be put to substantial expense in the course of litigation, that the trust assets could be substantially depleted, and that the courts may rule adversely to the assignee. Since the assignments drafted by the assignees required Graveraet to warrant he would become entitled, upon the death of his mother, to a principal interest in excess of one million dollars (a sum far greater than the total dollar-amounts of all of Graveraet's assignments up to and including the assignment of April 4, 1952), and inasmuch as the trust assets consisted of conservative investments in personalty and downtown Chicago real estate, and the Trustee was the First National Bank of Chicago, there was no reasonable risk the trust assets would be depleted so as to harm the assignees. As for the other possibilities Griffin listed, none are appropriate to be considered in determining what hazards, if any, were assumed by the assignee.

 In summary, the court is not persuaded that Cohen's and Griffin's affidavits raise a substantial controversy as to material facts. Nevertheless, in deference to the strict rule that a motion for summary judgment should be denied if there is any issue of fact, the court concludes it should not grant the summary judgment sought by Graveraet to defeat the entire claim asserted against

him; there is an element of doubt concerning the life expectancy of Mrs. Pratt and the value of the interests assigned by Graveraet. (The court's conclusion that a determination of the usury question would require a trial of these issues is based in considerable part on the circumstance that under the controlling New York statute, a holding that the assignments amounted to usurious loans would result in the forfeiture of both principal and interest.)

The only question remaining for determination is whether the countermovant (Graveraet) is entitled to a summary judgment in his favor in any respect.

Rapaport seeks to differentiate his position from that of the other subassignees who, of course, all stand in the shoes of their assignors. Brown v. Fletcher, D.C., 244 F. 854; Persky v. Bank of American National Ass'n, 261 N.Y. 212, 185 N.E. 77; In re Reif's Will, Sur., 30 N.Y.S.2d 47. Rapaport contends that even if the assignments were usurious loans, Graveraet is estopped from asserting such a defense as to him because of an affidavit executed by Graveraet on December 15, 1954. This affidavit purported to ratify and reaffirm Graveraet's assignments to Rosen and Rosen's subassignments to Hyman, consent to the reassignments by Hyman to Rapaport, and represent that all of Graveraet's assignments were valid and subsisting and that he had no defense, offsets, or counterclaim. Rapaport asserts that but for this affidavit he would not have taken the subassignments from Hyman.

 Of course, Rapaport does not have any benefit from this estoppel certificate merely by the fact of its existence. It is elementary that for Graveraet to be estopped, Rapaport must have actually relied upon its representations. The New York courts have long held that such certificates "amount to very little by way of estoppel, except where an innocent party believes in the statements contained in them, and acts upon them." Eitel v. Bracken, 38 Super. 7, 15. Where the assignee knows the facts, the certifi-

cate can work no estoppel. Fellows v. Wallace, 8 Abb.N.C. 351; Nichols v. Nussbaum, 10 Hun 214. For "to hold that a borrower might be so easily estopped from asserting the defense of usury would defeat the whole purpose and effect of the statute." Gleason v. O'Neill, 234 App.Div. 264, 254 N.Y.S. 814, 817.

When Rapaport procured the estoppel certificate and took the subassignments from Hyman, he knew how much Rosen had paid Graveraet for the five assignments; that Rosen had obtained insurance on Graveraet's life which was assigned to himself and that Graveraet had made warranties and executed affidavits along with each assignment. He knew the language and provisions of the assignments and of the warranties and affidavits, and he knew the ages of Mrs. Pratt and Graveraet at the time of each assignment. He also knew that assignors in transactions similar to these frequently contend the transactions are actually loans, not sales.[36]

In view of all this knowledge on the part of Rapaport, the court finds it difficult to understand his representation that he relied on Graveraet's affidavit so as to estop Graveraet from asserting his defense of usury. But, on the view this court takes as to the nature and effect of the assignment transactions themselves, it is unnecessary to decide this question.

It must be presumed, of course, that when Rosen drafted the assignment instruments he sought to avoid any application of the usury law. For this reason Rosen and his attorneys cast the transactions in the guise of sales, even to the point of inserting a disclaimer by Graveraet covenanting "there shall be no obligation on [his] part personally to pay any sum beyond the application" of his interest in the trust estate. Graveraet declares further that he has not "executed any promissory note or other in-

dicia of personal liability * * *." In connection with each assignment, Graveraet executed an affidavit acknowledging the nature of the transaction to be a sale and expressed an opinion that the consideration paid him was "fair and adequate in view of the hazards inherent in the transaction." Likewise, with each assignment, he signed a letter to the First National Bank as Trustee, reciting that he had "irrevocably assigned" a stated dollar portion of his interest in the trust estate.

Thus, insofar as the literary skill of counsel could make them appear, the transactions were caused to look like sales rather than loans. Actually, the extent each transaction was complicated by elaborate devices to demonstrate it was a sale and not a loan serves to arouse suspicion. As the Appellate Division remarked in the similar case of Wetzlar v. Wood, 143 App.Div. 311, 128 N.Y.S. 501, 504, affirmed 214 N.Y. 639, 108 N.E. 1111, "the successful effort to complicate the transactions and the procurement of affidavits in advance to support them have exactly the opposite effect to that intended."

These instruments must be construed most strongly against the claimants, who take through Rosen, since the latter's counsel drafted the documents. And, virtually all considerations which have in a long line of cases, led the New York courts to strike down similar transactions as usurious appear to be decisive here, subject only to proof of a life expectancy and a valuation of shares assigned. Such evidence, if and when adduced, would not lead inevitably to a conclusion that the transactions are void under the New York usury statute. For the assignments, construed against their draftsmen but in such a way as to avoid any imputation of illegality, may be treated as merely arrangements for the repayment of amounts advanced and, as such, transactions in the nature of equitable mortgages. Although presumed to

36. It is to be noted that Rapaport is a practicing New York attorney.

be a cloak for usury, transactions such as these lend themselves by taking on the form of a sale to the idea of such a security arrangement.

At the time of the several assignments here involved, the corpus of the trust consisted of large parcels of downtown Chicago real estate, including several long-term leaseholds, together with substantial quantities of high grade stocks and bonds. Rosen was informed of or was in a position to learn the precise trust holdings. Had Rosen intended for Graveraet to convey undivided fractional interests in the trust real estate and other corpus, he could have accomplished it without difficulty, for it is apparent that Graveraet signed what was put before him. However, no specific property is mentioned in any of the assignments. As counsel for Rosen recently characterized them in a brief before the Court of Appeals: "The assignments by (Graveraet) provide for the payment of specified sums of money out of his share of the Otto Young Estate and are not related to any particular asset or item of property in the estate." [37] The contrast between these assignment instruments and the Conveyance and Liquidation Trust Agreement, approved by this court on December 14, 1951, whereby the various remaindermen, including Graveraet, conveyed their interests to liquidation trustees for an orderly liquidation of the trust real estate after the death of the last life tenant, points up the absence of any attempt in the assignments to effect the conveyance of specific trust properties.

The assignment of April 4, 1951, fairly representative of all five assignments involved here, recites that Graveraet "desires to sell an interest to the extent of Sixty-two Thousand Five Hundred ($62,-500) Dollars of all of his right, title and interest in and to the principal of the trust fund * * *." Therefore, Graveraet grants, bargains, sells, assigns, trans-

fers, and sets over to Rosen all of his "right, title and interest in and to the principal of the estate of Otto Young, deceased * * * to the extent of Sixty-two Thousand Five Hundred ($62,500) Dollars." The document further recites that the interest Graveraet is assigning "is intended to include any and every interest [he] may have in the principal of said estate, no matter how derived, to the extent of Sixty-two Thousand five hundred ($62,500) Dollars * * *."

The most reasonable construction of this instrument is that it is an assignment of a specified sum in dollars to be paid out of Graveraet's distributive share in the corpus of the trust estate when the time for such distribution arrives. At the time of these transactions there were no identifiable dollars for Graveraet to assign or transfer. It seems clear, therefore, that each assignment transaction amounts to this: Rosen advanced a certain sum of money to Graveraet; Graveraet, in order to secure repayment of this sum, assigned a certain dollar-amount out of Graveraet's distributive share in the corpus. For the $15,000 received by him for the April 4, 1951, assignment, for example, Graveraet executed documents whereby Rosen would be in a position to claim $62,500 from Graveraet's distributive share, that is, the $15,000 advanced plus an additional sum of $47,500.

 To avoid any application of the usury statute, however, the court is of the opinion that the several assignments may be treated as advances or loans to be repaid at such time as Graveraet's share is distributed to him, together with interest at the legal rate. Since the instruments themselves contain no specification of interest, the law will imply that the obligations carry interest at the six percent rate permitted by New York statute. In reaching this conclusion the court has been impressed by the strikingly similar circumstances of Hall v. Eagle

37. Brief of Appellants in No. 12316, at p. 3, United States Court of Appeals for the Seventh Circuit.

Insurance Co., 151 App.Div. 815, 136 N.Y.S. 774, affirmed 211 N.Y. 507, 105 N.E. 1085, and the careful reasoning in the determination of that case. The New York court there came to an equitable result, avoiding the forfeiture necessitated by a finding of usury. The concern of the court in the Hall case to do substantial equity has found expression in subsequent New York decisions. Leavitt v. Enos, 155 App.Div. 584, 140 N.Y.S. 862; Stotesbury v. Huber, D.C., 237 F. 413; In re Reif's Will, Sur., 30 N.Y.S.2d 47. The uncontroverted facts here justify the conclusion that this is a case where the parties may have sought to abide by the law but the necessary effect of the bargain (cf. Fiedler v. Darrin, 50 N.Y. 437), if Graveraet's claim of value be upheld on trial, "was to disobey the provisions of the statute, and where it would be unconscionable and inequitable to allow either side to profit beyond what would have been strictly legal if there had been no basis for the interposition of a court of equity." Stotesbury v. Huber, D.C., 237 F. 413, 431.

The court has expressed itself at length. It remains only to provide for the further proceedings necessary to make disposition as contemplated by this decision.

The motion of Rapaport for a summary judgment in his favor must be refused on two grounds: The spendthrift clause in Otto Young's will bars the relief he seeks from the Trustee; and, Graveraet asserts a good defense on the merits (that the transactions are void for usury), even though such defense requires a trial of certain issues. The countermotion of Graveraet for summary judgment in his favor must also to this extent be denied: The spendthrift clause does not reach so far as to protect Graveraet from his creditors with respect to funds distributed into his hands by the Trustee, and in such event the assignment instruments impose trust obligations upon Graveraet which the claimants may enforce; furthermore, as to the defense of usury, certain essential facts might be controverted, and at least a limited trial would have to be conducted.

However, the court has concluded that no useful purpose would be served by setting this matter down, as Graveraet's counsel urges, for trial.[38] For, as pointed out, the assignment transactions constitute enforceable loans by Rosen to Gra-

---

38. Although the countermotion for summary judgment does not in terms claim the assignments were equitable mortgages, such claim is made in Graveraet's answer to the trustee's petition for instructions (the pleadings upon which issue has been joined). In Board of National Missions of Presbyterian Church in United States v. Smith, 182 F.2d 362, the Seventh Circuit Court of Appeals said (at pages 364–365): "The District Court, without expressly passing on the validity of the deed from Rankin and his wife to the trustee and the deed from the trustee to Rankin's widow, held that Rankin's will gave his widow a life estate with a power to sell and convey the fee and on that ground entered a summary judgment against the plaintiff. The plaintiff insists, however, that the defendant's motion for a summary judgment did not raise the issue of the construction of the will since the defendant's answer and motion were confined solely to the proposition that Olive L.

Rankin was in possession and held a clear fee simple record title to the property when the defendant, in good faith and for a fair consideration, purchased said property. The plaintiff, therefore, contends that the District Court committed error in granting defendant's motion for summary judgment on the question of the construction of Rankin's will * * * In our opinion pleadings before the District Court did show that there was no genuine issue as to any material fact and also showed as a matter of law that the defendant was entitled to a summary judgment on his motion. The fact that the judgment was granted on a reason different from that assigned by the defendant is immaterial, where, as here, the motion was properly granted on the undisputed facts shown and on an issue presented by plaintiff's complaint." Cf. Broderick Wood Products Co. v. United States, 10 Cir., 195 F.2d 433, 436: "If it affirmatively appears from the pleadings, admissions or

veraet at an implied six percent rate of interest. Claimants, therefore, are in position to require Graveraet, as trustee of funds distributed by the First National Bank as testamentary trustee (and as liquidation trustee), to repay the amount to which they are entitled, that is, their respective proportions of the amounts lent by Rosen to Graveraet, plus legal interest and other proper charges. All parties necessary to a complete disposition of the controversies being before the court, it is the court's plain duty to resolve the issues in this proceeding rather than compel the claimants to pursue their remedy against Graveraet in other tribunals.

The facts without substantial controversy are not sufficient to ascertain the precise amounts owed by Graveraet to the various claimants. Moreover, there is the proper allocation of fees and costs, including those of the Trustee, to be resolved. For such purposes a Master in Chancery should take an accounting among Graveraet and the several claimants who stand in the place of Rosen, the original assignee, in order to determine what amounts Graveraet is obliged to repay the claimants in lieu of Rosen out of the $321,500 sum to be distributed to him by the Trustee as part of his segregated share. The Master should also hear evidence and submit his recommendations concerning attorney and other fees and charges, and their proper allocation among Graveraet and the claimants.[39] With such an accounting stated, the court will direct the Trustee, as well as Graveraet as trustee under the assignment instruments, concerning final dispositions of the fund.

An order incorporating these determinations is being entered contemporaneously with the filing of this opinion.

depositions, and affidavits, if any, that there is no genuine issue as to any material fact upon which the outcome of the litigation depends, the case is appropriate for disposition by summary judgment and the court should enter such judgment. (Citations) And if the case is one appropriate for the entry of summary judgment, the fact that it may be granted on a ground different

from that specified in the motion therefor does not warrant the disturbing of the judgment on appeal."

39. In hearing evidence and submitting his recommendations, the Master should, of course, take note of Paragraph G of this court's order of October 29, 1956, and any subsequent orders relating to the segregated share of Graveraet.